[Civ. No. 12684. Second Dist., Div. Two. Nov. 24, 1941.]

MATTIE DEAN HUTCHINSON, Appellant, v. SAMUEL S. HUTCHINSON, Respondent.

Victor Ford Collins for Appellant.

Thurlow T. Taft, Richard K. Gandy and Robert Cockins for Respondent.

HANSON, J. *pro tem.*—This appeal by the former wife of the defendant involves a question of the construction of a declaration of trust, a property settlement agreement and a further question whether these instruments are illegal because of want of a legal consideration or unenforceable because of menace, duress and coercion alleged to have been practiced upon the husband by the wife before their divorce.

The controversy was initiated by the wife, who sought judgment for $76,862 which she averred had accrued to her since June, 1934, under the terms of the property settlement agreement. The trial court, over objection of the wife, received evidence to sustain the husband's claim that even though the declaration of trust or property settlement agreement provided otherwise, the parties intended that the home should be sold by the wife within a reasonable time after it was placed in trust, and since it was not sold the husband was not to be liable for the cost of its maintenance and other items which accrued subsequent to June 1, 1934. Additionally, the trial court found that the consideration for the two instruments was the compounding of a felony, and that the instruments had been obtained by the wife through menace, duress and coercion.

We think the evidence set forth in 290 pages of the transcript was largely inadmissible under the parol evidence rule, and that there is no competent evidence to sustain any of the findings in favor of the former husband.

The record discloses that plaintiff and defendant were married in Chicago on November 6, 1893, and were there divorced thirty-five years later. At the time of the marriage the parties had no property and the husband was then earning $15 per week; but by the year 1928, when the instruments herein involved were executed, he had amassed a considerable fortune, largely in the film business. At the time he, his wife and two children (one since deceased) lived in a 25-room home which the parties had built on Sheridan Way in Chicago. Its pretentiousness is perhaps somewhat indicated by the fact that in 1928 both parties hereto agreed it should not be sold for less than $300,000 nor rented for less than $1000 per month. In 1928 the parties separated, but before the actual separation took place the husband conveyed the Chicago home to the Northern Trust Company of Chicago in trust for the wife for life. By the terms of the declaration of trust, dated February 29, 1928, signed by the trustee, the wife, as beneficiary, and the husband, as settlor, it was provided that while the trustee might sell or lease the home during the first year of the trust only upon the written consent of the wife, it might thereafter either sell or lease it without her consent, provided it was sold for more than $300,000 or leased for at least $1000 per month; with a further proviso that these figures might be reduced with the written consent of the wife. No sale was ever made, and it was not until 1938 that the property was leased, and then at a rental of $200 per month.

The declaration of trust recited that the wife, in consideration of the provision therein made for her, released to the husband all her right, title and interest in and to twelve separate parcels of property owned by the husband. Coincident with the execution of the declaration of trust, and as a part of that transaction, the husband and wife executed a separate property settlement agreement. In the property settlement agreement it was recited that the husband recognized his obligation to provide adequately for his wife's support, and that until the property conveyed and transferred by him to the trustee should become income bearing she would be without means of support; and hence he agreed that until the home should be rented, and during all periods thereafter while it should be unrented, he would not only pay the wife $300 per month for her maintenance and support but would

also defray monthly all costs of lighting, heating, telephone and operating expenses "of said premises, *upon the present basis*," and additionally he would pay, while the premises were unsold or unrented, all taxes, insurance premiums and reasonable charges for maintenance and repairs.

On April 8, 1929, the husband, in order further to secure his wife in the payments to be made by him under the terms of the property settlement agreement, deposited with the First Trust and Savings Bank of Chicago three hundred and fifty shares of the common capital stock of The Celotex Company, to be held and be disposed of by the bank as set forth in a written agreement signed by the husband and the bank. This written agreement quoted pertinent paragraphs from the property settlement agreement and directed the bank to pay from any funds in its hands defendant's former wife $350 per month so long as the home was not sold, but in no event beyond five years from April 9, 1929, at which time if no sale of the home had been made the stock was to be returned to him.

In December, 1931, the wife, who was then living in Chicago, as she is at this time, caused a suit to be instituted here against her former husband to recover amounts she claimed at that time were due to her under the provisions of the property settlement agreement. In his answer defendant alleged that the amounts were not due because the wife had refused offers in excess of $300,000 for a sale of the home and offers in excess of $1000 per month for the rent thereof. No claim was made in the answer that the instruments sued upon had been obtained by reason of the compounding of a felony or because of menace, duress or coercion. The action was dismissed before it came to trial.

Upon the trial of the instant action defendant testified that when he was sued by his former wife in 1931 he told his then counsel, before they prepared his answer to that suit, the facts as to the compounding of a felony and the duress upon which he here relies. Whether his then counsel were of the opinion that the instruments were Illinois contracts and so not subject to such defenses we do not know. However, it is plain from the way in which they answered the suit that they interpreted the contracts as we do.

In the instant case counsel for the wife objected to questions directed to the ex-husband which sought to elicit con-

versations and oral agreements between the parties hereto to the effect that she had an obligation to sell the home at a lesser sum than $300,000 and to rent it for a lesser sum than $1000 per month. In overruling the objection the trial court said: "Well, there is no instrument at present; this is the transaction before anything was signed." A little later, to a question directed to the ex-husband as to whether anything had been said between the husband and wife about selling the property, objection was made: "That certainly is varying the terms of a written instrument, as I understand it. When people have reduced their contracts or agreements to writing. . . . The Court: It has not been signed yet, according to the testimony." After further argument by counsel for the wife the court said: "The written agreement takes the place of all that precedes it. The exception to that is where there is uncertainty or ambiguity in a contract or something of that sort or mutual mistake, or duress, you can always show all the surrounding circumstances under that allegation of duress because a man can put anything he wants in a contract and force someone else to sign it, and still it would be invalid. So I will overrule the objection."

The only evidence bearing on the claim that the husband had executed the instruments as a result of the compounding of a felony and because of duress, menace and coercion practiced upon him by the wife was the testimony of the husband, categorically denied by the wife. He testified that on a certain evening, while he and his wife were living together in the home, she told him she had made an appointment for him to go the following morning to the office of her attorney to discuss a property settlement; that he kept the appointment; that her counsel outlined to him the terms of the proposed agreement; that he told her counsel he did not believe it would be possible for him to make the large payments demanded for the support of his wife and the upkeep of their home; that her counsel told him that his wife had evidence that he had committed at least two criminal offenses and that she would have him indicted for those crimes if he did not sign the proposed agreement, but that if he did sign it he would have no trouble as far as his wife was concerned; that counsel informed him he did not need to decide right away but could study the matter over until the next morning, when the contract would be ready; that when he went home that

evening his wife told him that she wanted to talk to him "about this woman"; that she stated, "You know that I have got the goods on you and that woman"; that he told her he would not admit or deny anything to her about it, and that thereupon she replied that she had the evidence; that she then asked, "What do you think of the contract that Mr. Elting (her counsel) talked to you about?"; that he replied he didn't think it was very fair—that he didn't believe he could keep up the payments on it for very long, and unless the property was sold he wouldn't have the resources to keep on paying; that she replied that he knew what her attorney proposed he should sign; that he stated he did; that she inquired, "Don't you think you ought to sign it?"; that he replied he didn't know; that she thereupon told him he had better sign it; that when he inquired, "Why?" she told him she had evidence that would convict him under the Mann Act and that she would have him arrested if he didn't sign; that he inquired if he did sign would she ever have him arrested in the future; that she replied she would not and that she would not bother him; that the next day he went down to the office of her counsel and read over the property settlement agreement and signed it.

Upon question by the court as to whether he would have signed despite his claim of duress, the husband testified: "Well, I probably would not, but I don't know. He (her attorney) had me scared, so I just felt I had to sign it right away. I don't think I especially *considered* I was forced. I *felt* that I was forced into signing these." (Italics ours.)

 Upon this record the first question for determination is whether the law of California or the law of Illinois is here applicable. It is well established that the legality of a contract is to be determined by the law of the place where it was made, and its interpretation likewise. (Civil Code, sec. 1646; Rest., Conflict of Laws, sec. 347.) If the contract is legal in the state where it was made it will be enforced in another state unless the contract is contrary to the strong public policy of the forum. (Rest., Conflict of Laws, sec. 612.) As it appears that the declaration of trust and the property settlement agreement were made in Illinois by citizens of Illinois, and for aught that appears the obligations thereof were to be performed there, it is self-evident that the law of Illinois must control as to their validity and

interpretation. ■ Likewise, as the parol evidence rule is a rule of substantive law and not of evidence, Illinois law governs. (Rest., Conflict of Laws, sec. 599; *Air Conditioning Corp.* v. *Honaker,* 296 Ill. App. 221 [16 N. E. (2d) 153]; *Estate of Gaines,* 15 Cal. (2d) 255, 264 [100 Pac. (2d) 1055]; *Englestein* v. *Mintz,* 345 Ill. 48 [177 N. E. 746, 747].)

■ It is plain from a reading of the declaration of trust that the intention of the parties was to provide a home for the wife during her life in the home property conveyed to the trustee, so long as that home after the first year could not be sold for $300,000 or rented for $1000 a month. The language of the written instruments here involved is crystal clear. There is not the slightest ambiguity in them, and so we are at a loss to determine upon what theory the trial court concluded that parol evidence could be received to show that the parties contemplated that the home would be sold not later than April 8, 1934, or upon what theory the wife had any obligation either to sell or rent. It may be that the trial court was impressed by the cases, which the husband has cited to us, which hold that where a contract makes no provision.for its termination it should be deemed to terminate within a reasonable time. Such cases are not in point, for the obligation of the husband was to pay as long as the home was not sold or rented for the minimum amounts set forth in the instruments. It is true that the agreement for additional security, made by the husband in 1929, provided that if the home was not sold within five years, that is to say, prior to April 8, 1934, he should be entitled to receive back from the depository, The First National Bank and Trust Company, the collateral deposited by him or any substituted collateral. The critical date, i. e., April 8, 1934, designated for the return of the collateral, was designated for that one purpose only and it may not control the other written documents between the parties which it does not purport to control. The option to sell or rent for a lesser amount than that stated in the declaration of trust rested with the wife, not the husband. The obligation to sell or rent, in any case, rested with the trustee and not the wife.

We are not quite clear, from the quotations which we have made from the rulings of the trial judge in our recital of the record, whether he was of the opinion that evidence of conversations had between the parties, so long as they took

place prior to the actual signing of the contract, was admissible, as the language of his ruling would seem to indicate, or whether he was simply of the opinion that the contract was ambiguous and accordingly that it was admissible.

■ As we have pointed out that the contract was not ambiguous, the ruling in any event was erroneous. In that connection we think it important to observe here that it is the duty of the trial judge to determine in the first instance, before receiving any parol evidence which would vary or contradict a writing which is the basis of the action, whether or not the contract is ambiguous. If it is not ambiguous, so as to require evidence to assist in the interpretation of its terms, then the surrounding circumstances may not in any event be shown. Surrounding circumstances, as indicated, may no more be shown than evidence directly contradicting the terms of the writing where there is no ambiguity in it, or a need of interpretation of words in the connotation of their setting. (*Englestein* v. *Mintz, supra*; *Barnhart Aircraft, Inc.*, v. *Preston*, 212 Cal. 19 [297 Pac. 20].) Adherence to this suggestion will avoid needless evidence, taking the time of court, counsel and litigants, to say nothing of the costs involved.

■ Two further contentions made by the former husband below, and likewise sustained by the ·trial court, have as their base, first, that the agreements were void, as the only consideration therefor was the compounding of a felony, and, secondly, that the present action to recover, based on those agreements, is not maintainable if the two agreements, that is to say, the declaration of trust and the property settlement agreement, were obtained by reason of duress, menace or coercion. Both contentions stem from the same facts testified to by the husband and with respect to which we have already given the substance of his testimony. In that connection it is sufficient to say that Illinois follows the weight of authority in holding that where no criminal proceedings are pending the actual commission of the crime alleged to have been compounded must be shown. (*Keith* v. *Buck*, 16 Ill. App. 121. See also 17 C. J. S., sec. 228.) Here not only was there no such showing, but to the contrary the husband denied the offenses charged had been committed by him. Moreover, it appears that since *Rendelman* v. *Rendelman*, 156 Ill. 568 [41 N. E. 223], the law in Illinois has

been that "mere threats of imprisonment, for which there is no ground, do not constitute duress, as the person threatened could not be put in fear thereby. Nor do threats of criminal prosecution constitute duress when neither warrant has been issued nor proceedings commenced." In that case the testimony was that a party in endeavoring to procure the conveyance, which it was there sought to avoid, told the grantor that "he would have him looking through the bars if he did not sign it."

It seems clear from the Illinois decisions that a contract may not be avoided for duress, menace or coercion unless it is of a character sufficient to overcome completely the will of the party who seeks to avoid the contract by way of defense or rescission. There is no testimony here which measures up to these rules. It may be observed, in passing, that in this state the Supreme Court in *Woodham* v. *Allen,* 130 Cal. 194 [62 Pac. 398], said, "there could be no compounding of a felony where none existed." As it is evident that there was not under the Illinois law a compounding of a felony or duress, the contracts in question were legal in Illinois, and accordingly we have no occasion to pass upon the further contention of the wife that the husband was barred by laches or by his failure to place her *in statu quo* to avoid the contract for any alleged duress.

One further point made by the husband requires our consideration. He urges with much earnestness that even though the declaration of trust and the property settlement agreement were valid by the law of Illinois, where they were made, the courts of this state should refuse to enforce them on the ground of public policy because of the manner in which he claims they were procured. There are several answers to this contention. In the first place, this is not a case where the obligor received nothing or the obligee gave up nothing. Here the wife was entitled upon her separation for the fault of the defendant to be supported by him. Moreover, as additional consideration for the instruments she relinquished in favor of her husband her rights to a substantial amount of his property. The fact that the law in one state may differ from the law of another, whether it be in the enforcement of rights, the creation of rights, or the validity of contracts, is not of itself any reason for refusing to enforce contracts valid in the state where they are made. (*Biewend*

v. *Biewend*, 17 Cal. (2d) 108 [109 Pac. (2d) 701, 132 A. L. R. 1264].) We see no more danger to our public policy if we enforce these contracts because of a difference in law than did our Supreme Court in *Biewend* v. *Biewend, supra*, where it enforced a Missouri contract where there was as great, if not a greater, variance in the law of the two states as there is in this case. In the Biewend case the court said [p. 114]: "To hold that the right created in Missouri is so immoral as to be unenforceable here would involve a complacent attribution of moral superiority to this state."

We have here a duty to enforce valid contracts made in a sister state not only because of comity, but unquestionably a duty, on the facts, to do so because of the full faith and credit and due process clauses of the Constitution. As has been said by the Supreme Court of the United States, local public policy cannot transcend the limitations imposed by the federal Constitution. But apart from the limitations thus imposed, the trend of decision is unmistakably toward enforcing contracts, valid in the state where they were made, except where they are contrary to a strong public policy of the forum. (See *Hartford etc. Co.* v. *Delta etc. Co.*, 292 U. S. 143 [54 Sup. Ct. 634, 78 L. Ed. 1178, 92 A. L. R. 928].) Today, when the states of the Union are so closely linked together by rapid communication of speech and travel, the differences of policy between them are minor and the need of uniform enforcement of rights regardless of state lines is regarded as a business and social necessity.

For the reasons stated the judgment is reversed.

Wood (W. J.), Acting P. J., and McComb, J., concurred.

A petition for a rehearing was denied December 17, 1941, and respondent's petition for a hearing by the Supreme Court was denied January 21, 1942.