[L.A. No. 31900. July 29, 1985.]

LEO WONG, as Executor, etc., et al.,
Plaintiffs, Cross-defendants and Appellants, v.
TENNECO, INC., et al., Defendants, Cross-complainants and Appellants.

COUNSEL

Donald C. Thuesen for Plaintiffs, Cross-defendants and Appellants.

Hufstedler, Miller, Carlson & Beardsley, Shirley M. Hufsteder, Robert S. Thompson, Burton J. Gindler and Hillyer & Irwin for Defendants, Cross-complainants and Appellants.

OPINION

**REYNOSO, J.**—May a produce grower enlist the aid of the California courts to recover damages allegedly suffered as a result of losing his illegal farming operations in Mexico? We conclude that under principles of comity he may not.

I

This case traces the exploits of Lee Wong (Wong),[1] an accomplished produce grower best known for his green onions. In 1969, Wong, a United States citizen and a California resident, moved his farming operations to Mexico.

---

[1] Wong died in 1976, after this lawsuit was filed. The executor of his estate, Leo Wong, has maintained the suit, on behalf of the estate and L&A Investment Corporation, an entity owned and controlled by Wong. We use the name Wong to refer both to the decedent and to the plaintiffs as a group.

Wong was aware that Mexican law and policy prohibited foreign owner-ship and control of farming operations except in limited circumstances.[2]

---

[2]The Constitution of the United Mexican States of 1917 provides in relevant part:

"Art. 27

"I. Only Mexicans by birth or naturalization and Mexican companies have the right to acquire ownership of lands, waters, and their appurtenances, or to obtain concessions for the exploitation of mines or of waters. The state may grant the same right to foreigners, provided they agree before the Ministry of Foreign Affairs to consider themselves as na-tionals in respect to such property, and bind themselves not to invoke the protection of their governments in matters relating thereto; under penalty, in case of noncompliance with this agreement, of forfeiture of the acquired property to the Nation. Under no circumstances may foreigners acquire direct ownership of lands or waters within a zone of one hundred kilometers along the frontiers and of fifty kilometers along the shores of the country."

The Law for the Promotion of Mexican Investment and Regulation of Foreign Investment (Mar. 9, 1973) provides in relevant part:

"Art. 1—This is a public interest law and of general observance in the Republic. Its object is to promote Mexican Investment and to regulate foreign investment to stimulate a just and balanced development and to consolidate the economic independence of the country.

"Art. 2. For purposes of this law, foreign investment is considered to be that made by:

"I. Foreign legal entities;

"II. Foreign individuals;

"III. Foreign economic units without juridical personality; and

"IV. Mexican enterprises with a majority of foreign capital, or in which foreigners have, for any reason, the power to control the management of the enterprise.

"Foreign investment made in the capital of the enterprises, in the acquisition of assets and in the operations to which this law refers is subject to the provisions of this law."

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Art. 5. In the activities and enterprises listed below, foreign investment will be accepted in the following proportions of capital:

"(a) Exploitation and use of minerals;

"Concessions may not be granted or transferred to foreign individuals or companies. In companies engaged in such activity, foreign investment may be up to a maximum of 49% in the case of the exploitation and use of minerals subject to ordinary concessions and 34% in the case of special concessions for the exploitation of national mineral reserves.

"(b) Secondary petrochemicals: 40%,

"(c) Manufacture of parts for automotive vehicles: 40%, and

"(d) Other activities determined by specific laws or by regulations issued by the Federal Executive Power.

"In cases where legal provisions or regulations do not require a specific percentage, foreign investment may participate in a proportion not in excess of 49% of the capital of the enterprises, provided that it does not have, for any reason, the power to control the management of the enterprise.

"The National Commission on Foreign Investment may decide on the increase or reduc-tion in the percentage to which the preceding paragraph refers when in its judgment it is beneficial to the economy of the country, and may establish the conditions according to which foreign investment shall be accepted in specific cases."

"Foreign investment participation in the management bodies of the enterprise may not exceed its share in the capital.

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Art. 7. Foreigners, foreign companies and Mexican companies without an exclusion-of-foreigners clause may not acquire title to the land and waters in a strip within 100 kilometers [62 miles] of the borders and 50 kilometers [31 miles] of the beaches.

"Foreign companies may not acquire title to the land and waters or obtain concessions for the exploitation of waters.

"Foreign individuals may acquire title to the property to which the preceding paragraph

Accordingly, he recruited Mario Cota, a Mexican citizen, to act as his "front man" in running the operation. Legal title to the Mexican operation and its assets was placed in Cota's name and the names of other Mexican citizens hired to assist Cota. The land was leased in the names of these

---

refers with the prior authorization of the Ministry of Foreign Relations and the execution of the agreement to which paragraph I of the fourth paragraph of Constitutional Article 27 refers.

"Art. 8. Authorization from the proper Ministry, according to the type of economic activity involved, shall be required when one or more of the individuals or entities to which Article 2 refers, in one or several transactions, or in a series of transactions, acquire more than 25% of the capital or more than 49% of the fixed assets of an enterprise. Leasing of an enterprise or of the assets essential for its operation is treated the same as the acquisition of assets.

"Actions through which the management of an enterprise falls into the hands of foreign investors or through which foreign investment has, for any reason, the power to control the management of the enterprise are also subject to authorization.

"The authorizations to which this article refers shall be granted, if that is in the best interest of the country, upon prior resolution of the National Commission on Foreign Investment.

"Actions carried out without this authorization shall be null and void.

" . . . . . . . . . . . . . . . . . . . . . .

"Art. 28. Transactions which are carried out in violation of the provisions of the law or which, being required to be registered in the National Registry of Foreign Investment, are not so registered shall be null and void and shall not be enforceable before any authority. Furthermore, a fine of up to the amount of the transaction shall be imposed on the violator by the corresponding Ministry or Department of the government. Violations the amount of which cannot be measured shall be subject to a fine of up to 100,000.00 pesos [$8,000].

"Art. 29. Administrators, directors, general managers, and examiners of enterprises shall be jointly and severally liable, within the scope of their functions, for the observance of the obligations imposed by this law. Noncompliance shall be subject to a fine of up to 100,000.00 pesos [$8,000]. The penalties shall be imposed by the Ministry of Industry and Commerce after hearing the interested party.

" . . . . . . . . . . . . . . . . . . . . . .

"Art. 31. Imprisonment of up to nine years and fines of up to fifty thousand pesos [$4,000] shall be imposed on anyone who through misrepresentation permits enjoyment or actual control by individuals, enterprises or economic units, to which Article 2 of this law refers, of assets or rights reserved to Mexican nationals, or the acquisition of which would be subject to requirements or authorizations which had not been met or obtained, as the case may be.

"TRANSITIONAL RULES

" .

"Third. A period of 180 days from the date on which this law becomes effective is granted for persons obligated to do so to register in the National Registry of Foreign Investment."

It appears that the Foreign Investment Law codified long-standing policy of the Mexican Government to restrict foreign investment. (See, e.g., July 7, 1944, Presidential Decree, "Establishing the Temporary Requisite that Foreigners and Mexican Companies Which Have or Might Have Foreign Partners or Shareholders Must Obtain a Prior Permit in Order to Acquire Property.") The fact that the statutory provision was not in effect when Wong established operations is of little bearing in the present case. In the Court of Appeal, Wong conceded that "[t]he law of Mexico would preclude a foreigner from controlling a business in Mexico." Wong asserted, however, that "[t]he appellants did not control such a business." Moreover, the Foreign Investment Law clearly required Wong to register with the National Registry of Foreign Investment long before the parties dissolved their relationship in 1975. As Wong's claim for damages is based on losses allegedly suffered after the 1975 parting of the ways, the Foreign Investment Law is fully applicable.

individuals. The Mexican citizens grew, packed and shipped the produce under Wong's name and label using machinery, equipment and money provided by Wong. In 1973, Wong and Cota formed "Legumbres de Baja," a Mexican corporation with stock held by Mexican citizens for Wong, to run the farming operation.[3]

Wong's financial picture, gloomy prior to the move to Mexico, continued to deteriorate after operations got underway. To secure needed financing and to insure future crop sales, Wong entered into a series of agreements with Heggeblade-Marguleas-Tenneco, Inc. (H-M-T), a California corporation and wholly owned subsidiary of Tenneco, Inc. H-M-T, a produce broker, marketed produce throughout the United States and Canada. From the beginning of their relationship, H-M-T had full knowledge of the illicit nature of Wong's interest in the Mexican operation.

The first marketing contract, entered into in August 1971, gave H-M-T the exclusive right to market Wong's produce in exchange for business management and financial assistance. After deducting its commission and expenses, H-M-T was to remit the balance of the sales proceeds to Wong. Wong admittedly requested this financial set up as "a necessary part of doing business in Mexico . . . the only practical means by which an investor can exercise some degree of control over the enterprise and protect his interest in Mexico."

The parties renewed their marketing agreement an undetermined number of times, each time incorporating essentially the same terms. The last such contract, the basis for Wong's ultimate claim of breach of contract, was dated March 3, 1973.

Despite the success of the marketing arrangement, Wong's financial fortunes continued to dim, while his debt to H-M-T grew steadily to approximately $500,000. A self-confessed poor businessman, Wong apparently exacerbated his already weakened financial condition by diverting funds away from the Mexican operation for his own personal use. As a result, on July 24, 1974, at H-M-T's request, Wong executed a $300,000 promissory note to H-M-T, secured by a deed of trust on residential property in Laguna Niguel, California.[4]

---

[3]Article IV of the Constitution of the United Mexican States of 1917 expressly provides: "IV. Commercial stock companies may not acquire, hold or administer rural properties. Companies of this kind that are organized to operate any manufacturing, mining, or petroleum industry or for any other purpose that is not agricultural, may acquire, hold, or administer lands only of any area that is strictly necessary for their buildings or services, and this area shall be fixed in each particular case by the Federal or State Executive."

[4]From 1975 to 1979 H-M-T expended $108,816 to protect the property from foreclosure by prior trust deed holders and to cover taxes, insurance and repair expenses.

Wong's financial situation reached a crisis point in 1974 when the Mexican Government and other creditors began threatening the Mexican "front men" with foreclosure on personal assets for nonpayment of taxes and other debts related to the farming operations. Additional pressure from Tenneco, Inc., H-M-T's parent corporation, to lower the outstanding debt convinced the parties to set up an "imprest account" through which sales proceeds were funnelled to creditors. This system was maintained for the last three months of 1974.

It appears that this stopgap measure failed to remedy the situation. On January 10, 1975, H-M-T yielded to the Mexican growers' demands to sever its relationship with Wong and remit the sales proceeds directly to the growers. This move deprived Wong of control of the Mexican farming operation, effectively installing the Mexican growers as the "true owners." Operations ceased some time in 1976. The record is unclear whether the machinery was retained by the growers or impounded by the Mexican Government for nonpayment of taxes.

Wong then brought suit in San Diego County Superior Court against the Tenneco group,[5] alleging misrepresentation, breach of the marketing contract, breach of an oral contract to credit the produce sales proceeds against the note on the Laguna Niguel property, intentional interference with advantageous business relations, negligence, conversion and conspiracy. On each cause of action Wong sought $10,350,000 in compensatory damages representing $1.6 million in produce sales, which Wong claims H-M-T wrongfully diverted to the Mexican growers after January 10, 1975, and the fair market value of the Mexican operation, including machinery, equipment, facilities, brand names and labels. He also prayed for $1 million in punitive damages. The Tenneco group cross-complained for recovery of the $500,000 debt and foreclosure on the deed of trust.

While the case was pending, the Laguna Niguel property sold for $682,500. Pursuant to a stipulated agreement filed with the court on October 31, 1979, Tenneco West, successor in interest to H-M-T, retained the proceeds pending the outcome of the litigation. The parties further stipulated that the court, not the jury, would determine the ultimate disposition of the funds.

Trial was bifurcated, with the court reserving judgment on the Tenneco group's motion for nonsuit based on the defense of illegality under Mexican

---

[5]The Tenneco group includes: Tenneco, Inc., the parent corporation, and Tenneco West, Inc., and H-M-T, two wholly owned subsidiaries.

law, until after the jury rendered its verdicts.[6] After a six-week trial, the jury returned a verdict for Wong in the amount of $1,691,422 for breach of a written and oral contract, interference with an advantageous business relationship and negligence.[7] The jury also returned a verdict for the Tenneco group on the cross-complaint in the amount of $595,510.

Following the verdicts, the trial court ruled that Wong was barred from recovery under the "unclean hands" doctrine because the entire transaction was illegal under the laws of the Republic of Mexico. The court concluded, as a matter of law, that "all of plaintiffs' claims and alleged damages are based upon their past and the assumed continuing violations of the laws and public policy of Mexico and, under the principle of comity, the public policy of the State of California. . . . The Court leaves the parties where it finds them. No party is entitled to judgment on its claims." To preserve the *status quo ante litem motam,* the court ordered Tenneco West to return the proceeds for the sale of the real property to Wong together with interest at the rate of 7 percent per annum.

## II

Instead of a standard contract claim we deal with a question of the respect due the constitution and statutory laws of a sovereign nation. The parties entered into this produce marketing/financing arrangement with full knowledge that the farming operations upon which the agreement depended were being carried out in violation of Mexican law.[8] When one party abandoned the floundering scheme, the other sought redress in the California

---

[6]The court denied the Tenneco group's motion for nonsuit after the plaintiffs rested, stating that it would better serve efficiency to first allow the jury to render a verdict and then entertain a motion for judgment notwithstanding the verdict if the verdict did not come in for the defendants.

[7]Before the plaintiffs rested their case, the court struck their punitive damages claim for failure to make out a prima facie case for such damages. The trial court also granted directed verdicts for the Tenneco group on Wong's causes of action for misrepresentation and conversion and conspiracy.

[8]The dissent suggests that Wong did nothing illegal under Mexican law. However, in argument before this court, Wong conceded that the farming operation was illegal under Mexican law and that the marketing/financing contract would be unenforceable in Mexico as a result. Further, the dissent's reference to the officially distributed pamphlet encouraging foreign investment in Mexico is puzzling. The quoted language simply highlights the illegal nature of Wong's operations. According to the pamphlet, foreign investors are welcome in Mexico so long as they comply with applicable law, including the "Law to Promote Mexican Investment and to Regulate Foreign Investment." (*Post,* pp. 138-139.) While the dissent is correct that foreign investment in farming is not absolutely banned, the Law to Promote Mexican Investment does limit foreign investment to 49 percent of the capital of any enterprise not otherwise restricted, absent authorization from the "proper Ministry." (See *ante,* fn. 2.) Wong failed to obtain the necessary authorization, preferring instead, it appears, to conceal his ownership from the Mexican authorities altogether.

courts, to recover that which was unrecoverable under Mexican law. The trial court properly declined to involve our courts in this flagrant effort to circumvent Mexican law.

The doctrine of comity is fully applicable in the present case. ■ Under that longstanding principle of the law of nations, the forum state will generally apply the substantive law of a foreign sovereign to causes of action which arise there. (*Loranger* v. *Nadeau* (1932) 215 Cal. 362, 366 [10 P.2d 63, 84 A.L.R. 1264]; *Blythe* v. *Ayres* (1892) 96 Cal. 532, 561 [31 P. 915]. See *Stockton* v. *Ortiz* (1975) 47 Cal.App.3d 183, 200 [120 Cal.Rptr. 456].) The philosophy behind the comity doctrine is easily identified: respect for the sovereignty of other states or countries, " 'considerations of mutual utility and advantage' " (*Blythe, supra,* 96 Cal. at p. 561), and "business and social necessity" (*Hutchinson* v. *Hutchinson* (1941) 48 Cal.App.2d 12, 22 [119 P.2d 214]). It is the first of these factors that is central to our inquiry today and compels the application of Mexican law.

Since 1917, Mexico's Constitution has expressly prohibited alien ownership or control of Mexico's land or waters. This restriction represents that country's abiding commitment to the preservation and management of scarce resources for the benefit of the Mexican people, a commitment fostered by a sobering history of exploitation of the land, and its people, by foreign interests.

Mexico's statutory law governing foreign investment contains ownership limitations similar to those expressed in its Constitution. However, neither the Constitution nor the statute wholly preclude foreign investment in Mexico's resources. Foreigners who agree to respect the autonomy and ultimate authority of the Mexican government may acquire ownership interests in many of the country's natural resources.[9] Thus, Mexico has sought to strike a balance between the needs of its people, the country's developmental requirements and the desires of foreign investors for economic advantage.

■ Consistent with our duty to respect Mexico's right to determine her own internal policies, we should defer to her laws implementing those policies when they are directly implicated in the case at hand. To do otherwise would unnecessarily upset the relationship of friendship and mutual respect we enjoy with our southern neighbor. In seeking to achieve substantial justice we must not overlook any international interests that may be affected by our decisions.

---

[9]The Constitution flatly forbids foreign ownership of land or waters within a certain distance from the frontiers and the sea.

In the instant case, purposeful violation of Mexican law is clear. Wong made no effort whatsoever to comply with the requirements of Mexican law. Instead, he concocted an elaborate scheme by which the Mexican authorities were kept in the dark as to his ownership interest while he reaped the benefits of the illicit operation. He then sought to enlist the aid of our courts, claiming that since he was the "true owner" of the Mexican operation, he was entitled to anticipatory damages representing the profit he would have realized but for H-M-T's breach of the marketing contract which resulted in the Mexican growers' takeover of the project. Although comity does not absolutely mandate application of foreign law (*Whitney* v. *Dodge* (1894) 105 Cal. 192, 195 [38 P. 636]), on these facts we can do no less.

■   Comity teaches that "a contract . . . made with a view of violating the laws of another country, though not otherwise obnoxious to the law . . . of the forum . . . will not be enforced." (15 Williston on Contracts (3d ed. 1972) § 1748, p. 121.) Such contracts are treated as against the public policy of the forum. (*Ibid.*) This principle is simply the logical extension of the well-settled rule that the courts will not aid a party whose claim for relief rests on an illegal transaction. As this court emphasized in *Lee On* v. *Long* (1951) 37 Cal.2d 499 [234 P.2d 9], a case in which a group of gamblers unsuccessfully sought to recover the spoils of their illicit activities: " 'No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; . . . .' Nor is this established rule limited in its application to parties to the illegal transaction as distinguished from an attempt to set up a claim *against a third party* based on the law's violation. [Citations.] '*[T]he test [is] whether the plaintiff can establish his case otherwise than through the medium of an illegal transaction to which he himself is a party.*' " (Italics added.) (*Id.*, at p. 502; see also *Hamilton* v. *Abadjian* (1947) 30 Cal.2d 49, 52 [179 P.2d 804] and *Lane & Pyron, Inc.* v. *Gibbs* (1968) 266 Cal.App.2d 61, 64-65 [71 Cal.Rptr. 817] (neither California nor Nevada courts will lend their process to recovery of gambling debts).) As Wong is unable to satisfy this test, comity requires us to reject his claim.

■   The "public policy" exception to the comity doctrine is inapplicable in the present case. That exception precludes application of a foreign state's law where to do so would violate California's public policy. (*Severn* v. *Adidas Sportschufabriken* (1973) 33 Cal.App.3d 754, 763 [109 Cal.Rptr. 328]. See *Estate of Lathrop* (1913) 165 Cal. 243, 248 [131 P. 752]; *Whitney, supra,* 105 Cal. 192, 199.) The standard, however, is not simply that the law is contrary to our public policy, but that it is so offensive to our public policy as to be " 'prejudicial to recognized standards of morality and to the general interests of the citizens . . . .' " (*Knodel* v. *Knodel* (1975) 14 Cal.3d 752, 765, fn. 15 [122 Cal.Rptr. 521, 537 P.2d 353], quoting *Biew-*

*end* v. *Biewend* (1941) 17 Cal.2d 108, 113 [109 P.2d 701, 132 A.L.R. 1264].) Moreover, even where it is agreed that a foreign law offends public policy, it may still be applied in a limited context where the potential harm is minimal. (See, e.g.,. *Nevcal Enterprises, Inc.* v. *Cal-Neva Lodge, Inc.* (1961) 194 Cal.App.2d 177 [14 Cal.Rptr. 805] [contract for purchase of Nevada casino accomplishes a legal objective in Nevada and does not conflict with California public policy because California permits other types of gambling]; *Estate of Bir* (1948) 83 Cal.App.2d 256 [188 P.2d 499] [in the context of intestate succession only, India's law permitting polygamy will be applied under principles of comity].)

■ California public policy is not offended by the application of Mexican law in the present case. California constitutional and statutory law expressly provide that noncitizens may own land within the state.[10] However, the land with which we deal is situated in Mexico and it is a fundamental principle of the law of conflicts that questions relating to control of real property are to be determined by the law of the jurisdiction in which the property is located. (See *Barber* v. *Barber* (1958) 51 Cal.2d 244, 247 [331 P.2d 628]; *Estate of Patmore* (1956) 141 Cal.App.2d 416, 424 [296 P.2d 863]; *Cummings* v. *Bullock* (9th Cir. 1966) 367 F.2d 182, 183.) Mexico's history, we have noted, has led to a different approach. That California public policy regarding land ownership differs from the equivalent Mexican policy does not suggest that long-established conflicts principles should be abandoned.

Moreover, we cannot say that the Mexican law is so antagonistic to California public policy interests as to preclude the extension of comity in the present case. The protectionist sentiment that the law reflects has no prejudicial impact upon "recognized standard of morality" in this state. Nor does it adversely affect the "general interests of Californians." Law abiding Californians wishing to invest in Mexico or California will be unimpeded by application of Mexican law in this instance.

In *Biewend, supra,* 17 Cal.2d 108, a case involving the enforceability of an order for payment of alimony rendered by a Missouri court, this court cautioned: "To hold that the right created in Missouri is so immoral as to be unenforceable here would involve a complacent attribution of moral superiority to this state." (*Id.,* at p. 114. See also *Hutchinson* v. *Hutchinson* (1941) 48 Cal.App.2d 12, 22 [119 P.2d 214].) This concern takes an even

---

[10]Article I, section 20 of the California Constitution provides: "Noncitizens have the same property rights as citizens." Civil Code section 671 provides: "Any person, whether citizen or alien, may take, hold, and dispose of property, real or personal within this State."

greater importance in the context of international relations.[11] Consistent with this reasoning, we conclude that the Mexican law in question is not violative of California public policy.

Protection of persons, like Wong, who wrongfully seek to circumvent the substantive laws of one jurisdiction by enlisting the aid of the courts in another violates and offends the public policy of both jurisdictions.[12] In the interest of comity, our courts must vigilantly resist such recruitment efforts.[13]

### III

Applying principles of comity, we conclude that Wong's failure to comply with the requirements of Mexican law casts a pall of illegality over all of

---

[11]This is not to suggest, however, that we must blindly defer to the law of another country. Where, for example, such a law directly conflicts with procedural or substantive safeguards designed to insure due process and fairness in our legal system, it will not be enforced. It is against the public policy of this state to enforce any foreign law which interferes with discovery or other rights afforded litigants in our courts. (See generally *Volkswagenwerk Aktiengesellschaft* v. *Superior Court* (1981) 123 Cal.App.3d 840 [176 Cal.Rptr. 874].)

[12]In *Stockton* v. *Ortiz* (1975) 47 Cal.App.3d 183 [120 Cal.Rptr. 456], the Court of Appeal denied recovery in a case not unlike the one at bench. There, a California businessman sought to recover his substantial investment in a hotel operation in Mexico. As in the present case, the plaintiff had engineered the transaction to make it appear that the hotel was owned by Mexican nationals to avoid the restrictions of Mexican law. The Court of Appeal noted: "The business venture having failed, and apparently unable to sue in Mexican courts, he seeks assistance of the California courts to recoup his losses and unspin the web so carefully and apparently illegally spun in Mexico. [¶] . . . California procedure and substantive law, coupled with the conflicts-of-laws and the 'doctrine of comity,' have operated to strip away national boundaries . . . . We leave the parties where we found them." (*Id.*, at p. 200.)

[13]This is not a "true" conflict of laws case requiring additional analysis of the respective interests of the states involved. (See *Offshore Rental Co.* v. *Continental Oil Co.* (1978) 22 Cal.3d 157 [148 Cal.Rptr. 867, 583 P.2d 721]; *Bernhard* v. *Harrah's Club* (1976) 16 Cal.3d 313 [128 Cal.Rptr. 215, 546 P.2d 719]; *Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574 [114 Cal.Rptr. 106, 522 P.2d 666]; *Reich* v. *Purcell* (1967) 67 Cal.2d 551 [63 Cal.Rptr. 31, 432 P.2d 727].) The "governmental interest analysis" is applicable only where "the two 'involved states' [citation], have different laws governing the issue presented in the case at bench . . . [and] *both* states have an interest in having their respective laws applied." (*Bernhard, supra*, 16 Cal.3d at p. 317.) Where, as here, only one state "'has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied.'" (*Hurtado, supra*, 11 Cal.3d at 580, quoting from Currie, Selected Essays on Conflicts of Laws (1963) p. 189.)

According to the dissent, the only governmental interest affected in the present case is California's interest in "compensation, punishment and deterrence" when a party commits a tort or breaches a contract entered into in California, between Californians, to be substantially performed in California. (*Post*, p. 143.) Considering the contract without regard to the underlying illegality of the venture being financed, this conclusion is self-evident. Principles of equity and comity, however, preclude us from taking such a limited view. (See *ante*, at p. 135.) Because the farming operation was illegal under Mexican law, the only California interest implicated is our public policy against enforcement of a contract dependent upon violation of the laws of another sovereign.

his business transactions tied to the Mexican farming operation, including the marketing/financing arrangement with H-M-T. Although this court has identified several exceptions to the general rule that the courts will not grant relief under the terms of an illegal contract (*Tri-Q, Inc.* v. *Sta-Hi Corp.* (1965) 63 Cal.2d 199, 216-220 [45 Cal.Rptr. 878, 404 P.2d 486]), none is applicable in the present case.

The necessity of discouraging these types of arrangements "outweighs equitable considerations of possible injustice as between the parties" (*Southfield* v. *Barret* (1970) 13 Cal.App.3d 290, 294 [91 Cal.Rptr. 514]). As the trial court pointed out: "[Wong] seeks anticipatory damages resulting from the discontinuance of an illegal transaction . . . [the jury awarded] damages for loss of profits Wong would have received had the illegal arrangement continued and . . . for the loss of equipment he did not own and had no right to control under Mexican law. [Wong] had been at it for some time . . . [b]ut H-M-T was well aware of the problem and cooperated with [Wong] in an effort to circumvent Mexican law."

California public policy dictates that we leave the parties as we found them.[14] Only one exception applies: the Tenneco group is entitled to retain $108,816 of the sales proceeds from the Laguna Niguel property. This represents the amount the Tenneco group expended to protect the property, thereby preserving the asset for the benefit of both parties. To return it to Wong would constitute unjust enrichment.

The San Diego County Superior Court is ordered to modify the judgment to permit the Tenneco group to retain proceeds from the sale of the Laguna Niguel property in the amount of $108,816. As so modified the judgment is affirmed. Each party to bear their own costs.

Bird, C. J., Broussard, J., Grodin, J., Panelli, J.,* and Channell, J.,* concurred.

**MOSK, J.**—I dissent. The majority predict their result by improperly framing the question: they repeatedly refer to the produce grower's "illegal farming operations." It is my opinion that this grower did nothing illegal, and that his operation was consistent with the method of land holding used by thousands of American investors and residents in Mexico.

---

[14]We decline the Tenneco group's request that we remand the case to the Court of Appeal on their cross-complaint concerning Tenneco West's right to retain the proceeds of the sale of the Laguna Niguel property. The reasoning that compels us to reject Wong's claim for relief applies with equal force to the cross-complaint.

*Assigned by the Chairperson of the Judicial Council.

Furthermore, from the outset Tenneco was completely familiar with Wong's operation and acquiesced in its technique. Only when the farming project failed to make money did Tenneco become strangely righteous.

## I.

The majority rely on sections of the Mexican Constitution which purport to restrict land ownership to Mexicans by birth or naturalization. At the same time, Mexico encourages foreign investment. A report published for distribution in Mexican consulates declares: "Mexico welcomes foreign investment, provided that the prospective foreign investors comply with laws and regulations which control such investments in accordance with the needs of the Mexican economy. The applicable legal provisions are the following: Law to Promote Mexican Investment and to Regulate Foreign Investment (published on March 9, 1973 Official Journal of the Federal Government in force since May 8, 1973); Regulations of the National Registry of Foreign Investment (Of. Jour. XI/6/75-VII/27/77-IX/6/77); Mexican Immigration Law (Ley General de Población Of. Jour. I/7/74); Regulations to the Immigration Law (Of. Jour. XI/17/76)."

There are specific areas in which foreign investment is prohibited and funding is reserved to the government in accordance "with the needs of the Mexican economy." These are oil, basic petrochemicals, radioactive products, nuclear energy, direct mining, electric power, railroads, radio and wire communications. Other areas are reserved to Mexican investors exclusively: radio and television, bus transportation, air and sea transportation, forestry, distribution of gas and liquified gas. *Conspicuously absent from those reserved occupations is farming*, the occupation involved herein.

Thousands of Americans, many of them retired persons, live in Mexico. They invest in, and occupy, homes and farms, but in order not to offend the Mexican constitutional restriction, title is held in trust for them by a Mexican bank, title company, or individual. This is not done covertly, but openly, and it is accepted as an appropriate policy by Mexican officials. Indeed, the process is frequently advertised in publications in order to encourage Americans to live south of our border and to help stimulate the Mexican economy.

As the majority relate, Wong invested in Mexican farm land, though title was held as an accommodation by one Mario Cota, a Mexican citizen. Wong and Cota then formed a Mexican corporation, with stock held by Mexican nationals, to run the farming operation. There was nothing improper, immoral or illegal about that enterprise. And Tenneco, which entered into marketing agreements in California for the produce of the enterprise, was

fully aware of the manner in which title was held. Until Wong's financial fortunes waned, Tenneco was happy to accept the benefits of successive marketing contracts. Its sense of misguided morality appears to have risen in direct proportion to its decline in revenue.

The trial court's procedure is puzzling. It originally declined to dismiss the complaint on defendant's motion on the ground of illegality. An entire trial was held, and the matter submitted to a jury. Only after the jury returned a substantial verdict for plaintiff did the purported illegality of the transaction suddenly appear to the court. While one must accept wisdom even if it appears late, I cite the foregoing sequence to show that any purported illegality of the transaction was too subtle to be readily manifest.

## II.

Assuming arguendo that there had been some illegality in Wong's original operation in Mexico—a fact I do not concede—the transaction there has long since terminated. This is not a situation in which California courts have been asked to lend their dignity to a continuing transaction. "[W]hen the illegal transaction has been consummated; when no court has been called upon to give aid to it; when the proceeds of the sale have actually been received, and received in that which the law recognizes as having had value; and when they have been carried to the credit of the plaintiffs, the case is different. The court is there not asked to enforce an illegal contract." (*Planters' Bank* v. *Union Bank* (1872) 83 U.S. 483, 499-500 [21 L.Ed. 473, 479-480], cited with approval in *Denning* v. *Taber* (1945) 70 Cal.App.2d 253, 257 [160 P.2d 900], and in *Norwood* v. *Judd* (1949) 93 Cal.App.2d 276, 287 [209 P.2d 24].)

Here the contractual relation had ended five and a half years before the judgment. The breaches of contract and the torts terminating the relationship between the parties occurred on January 10, 1975. The trial court found the purported illegality in June of 1981. Wong had been dead five years when the court ruled. Those facts do not indicate the court is condoning a continuation of illegality, even if there had been such conduct previously.

In *Asdourian* v. *Araj* (1985) 38 Cal.3d 276 [211 Cal.Rptr. 703, 696 P.2d 95], a majority of this court, including the author of the present majority opinion, held that illegal conduct in the form of violation of a statute does not necessarily deprive a party of the benefit of his contractual arrangements. As the chief justice wrote at page 289, "Defendant attempts to rely on a technicality to defeat plaintiff's claims. This technicality is unrelated to defendant's real dispute with plaintiff—the *terms* of the . . . agreements. That dispute was resolved by the trial court [here the jury] in plaintiff's

favor. To allow defendant to prevail on a technicality would be to allow [the law] to be used as a ' "shield for the avoidance of a just obligation." ' " (Accord, *Poorman* v. *Mills & Co.* (1870) 39 Cal. 345, 353.)

The majority in *Asdourian* found there was nothing *malum in se* about the contract between the parties, that the defendant was a sophisticated businessman, and that to deprive the plaintiff of his remedy would provide the defendant with unjust enrichment. (*Asdourian* v. *Araj, supra,* 38 Cal.3d at p. 293.) The case before us is much stronger. The California parties violated no California law, and even in Mexico their conduct was, under the majority's theory, at most arguably *malum prohibitum.* Tenneco was hardly an unsophisticated victim of the plaintiff, a struggling grower. And to deprive this plaintiff of the verdict reached by a jury that heard all the evidence produced by both sides would indeed magnanimously bestow an unjust enrichment on Tenneco. The unjust enrichment is substantial: remission of a jury verdict of more than a million and a half dollars. Under any standard, that is an egregious sanction to impose on a Californian who violated no law of California and whose contractual dealings in California were undertaken with a knowledgeable California corporation fully advised of all his operations.

### III.

I sharply disagree with the majority's reliance on Mexican law to uphold Tenneco's defense of illegality under a theory of comity.

Comity is based on the concept of interstate courtesy, by which a forum state will permit application of a foreign law in the interest of promoting justice or out of respect for the laws and institutions of a foreign state. (*Estate of Lund* (1945) 26 Cal.2d 472, 489 [159 P.2d 643, 162 A.L.R. 606].) However, a well established exception to the rule of comity precludes application of foreign laws that are contrary to the public policy of the forum state.

Comity does not require application of Mexican law in this case. California's public policy, as expressed in its Constitution and statutes, is to allow ownership of property without regard to citizenship. (Cal.Const., art. I, § 20: "Noncitizens have the same property rights as citizens"; Civ. Code, § 671: "Any person, whether citizen or alien, may take, hold, and dispose of property, real or personal, within this state.") We have come a long way since the days of alien land laws (*Sei Fujii* v. *California* (1952) 38 Cal.2d 718 [242 P.2d 617]) and must not retreat now by submitting to xenophobia from any source, however well intentioned.

The citizenship-based Mexican law invoked by the trial court and the majority is directly contrary to the foregoing California policy, under which a Mexican citizen may own property in California. The "rule of comity is subject to the principle that foreign laws will not be given effect when contrary to the settled public policy of the forum." (*Biewend* v. *Biewend* (1941) 17 Cal.2d 108, 113 [109 P.2d 701, 132 A.L.R. 1264], overruled on another ground in *Worthley* v. *Worthley* (1955) 44 Cal.2d 465, 470 [283 P.2d 19]; accord, *Severn* v. *Adidas Sportschuhfabriken* (1973) 33 Cal.App.3d 754, 763 [109 P.2d 328]; *Victor* v. *Sperry* (1958) 163 Cal.App.2d 518, 525 [329 P.2d 728]; *Thome* v. *Macken* (1943) 58 Cal.App.2d 76, 78-81 [136 P.2d 116]; see also 15 Williston on Contracts (3d ed. 1972) § 1748, pp. 124-126, § 1792, pp. 371-373.)

Under the majority's inflexible concept of comity, we would be required to recognize and enforce in our courts the racial laws of South Africa, the religious laws of Iran and the sexually discriminatory laws of Saudi Arabia. But discrimination on the basis of nationality is just as repugnant to our public policy as discrimination because of race, religion or sex. Indeed, the Unruh Civil Rights Act specifically prohibits discrimination on the basis of "sex, race, color, religion, ancestry or *national origin*" in all business enterprises. (Civ. Code, § 51, italics added.)

## IV.

The citizenship-based law of Mexico is also suspect under controlling international instruments. The Universal Declaration of Human Rights was adopted by the General Assembly of the United Nations on December 10, 1948. It was subsequently ratified by both the United States and Mexico. A treaty, of course, is universally recognized as the highest law of the land. Article 17 of the Universal Declaration provides in section 1 that "*Everyone has the right to own property alone as well as in association with others.*" (Italics added.) No limitation as to citizenship is provided as an exception. Section 2 of the article declares further that "no one shall be arbitrarily deprived of his property."

The United States and California are plainly in conformity with the foregoing declaration: we permit no nationality or citizenship barrier to the ownership of property. By contrast, there is a serious question whether Mexico's restrictions remain consistent with its international obligations.

## V.

The judgment cannot be affirmed under California's governmental-interest approach to conflict of law issues. "The governmental interests approach is

applicable not only to situations involving multistate contacts but also to those involving a state of the United States vis-à-vis a political entity of a foreign country." (*Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574, 580, fn. 2 [114 Cal.Rptr. 106, 522 P.2d 666].) The 1973 marketing contract was legal and enforceable under California law but arguably, according to the majority, not under Mexican law. In light of these differing laws, we first examine the underlying policies to determine whether both California and Mexico have an interest in application of their respective laws. (*Offshore Rental Co.* v. *Continental Oil Co.* (1978) 22 Cal.3d 157, 163 [148 Cal.Rptr. 867, 583 P.2d 721]; *Bernhard* v. *Harrah's Club* (1976) 16 Cal.3d 313, 317-318 [128 Cal.Rptr. 215, 546 P.2d 719].)

California's policy of allowing ownership of property without regard to citizenship is involved here more as a matter of principle than as a practical matter, given the foreign location of Wong's farming operation. However, California's general policies of affording relief to its citizens who have suffered a breach of contract or a tort (see Civ. Code, §§ 3300, 3333) and of punishing and deterring wrongful conduct (see Civ. Code, § 3294, subd. (a)) give it a strong interest in application of its law. Similarly, Mexico could contend its policy preserving domestic ownership and control of its natural resources gives it an interest in application of its law. Thus it can be argued that there is a true conflict.

"Once [a] preliminary analysis has identified a true conflict of the governmental interests involved as applied to the parties under the particular circumstances of the case, the 'comparative impairment' approach to the resolution of such conflict seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state. This analysis proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied." (*Bernhard* v. *Harrah's Club, supra,* 16 Cal.3d at p. 320; also see *Reich* v. *Purcell* (1968) 67 Cal.2d 551, 553-554 [63 Cal.Rptr. 31, 432 P.2d 727].) Application of Mexican law in this case would completely impair California's interests in compensation, punishment and deterrence. Application of California law, however, would not affect Mexico's interests in any respect.

Even if Mexico has a governmental interest in protecting land holdings within its borders, in the present instance it has given no indication that it regards this business, or any similar operations, improper. If the government of Mexico had any concern about this litigation, it could have requested participation. No Mexican interest has been asserted in this lawsuit except by Tenneco, a wholly unaffected non-Mexican entity.

On the other hand, California has an overwhelming governmental interest in this case. The contract was made in California, between California citizens, with respect to a loan made in California, secured by real property situated in California. The receipt and sale of the produce, the essential part of performance, took place in California. The negligence of Tenneco, as found by the jury, occurred in California. The intentional interference with business relations occurred in California. The forum, selected by the parties, was California. To maintain that conflict of law principles compel application of the law of Mexico is to ignore all the foregoing facts as well as unwavering California policy. Worse, such conclusion is regressive and does violence to basic principles of conflicts developed over the years by experts in the field. I doubt that any would sanction the curious result of the present majority. (See, e.g., Justice Traynor's opinion in *Grant* v. *McAuliffe* (1953) 41 Cal.2d 859 [264 P.2d 944, 42 A.L.R.2d 1162]; Cavers, The Choice-of-Law Process (1965) p. 139; Juenger, *Conflict of Laws* (1984) 32 Am.J.Comp.L. 1, 17-18.)

In reality, however, there is no genuine conflict of law here, but rather a false conflict. When only one state has an interest in applying its law, the conflict is false. (*Ashland Chemical Co.* v. *Provence* (1982) 129 Cal.App.3d 790, 793-794 [181 Cal.Rptr. 340].) California has a prime interest in applying its law to protect the rights of its citizens to engage in business, to enforce contractual rights, and to seek redress for tortious conduct committed within its borders. The interest of Mexico is in no way realistically advanced by frustrating California's protection of its citizens. Under such circumstances, California, the only state with a true governmental interest, should apply its law, not that of Mexico. "When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied." (Currie, *The Constitution and the Choice of Law: Governmental Interests and the Judicial Function* (1958) 26 U.Chi.L.Rev. 9, 10.)

## VI.

Finally, when the purpose of the Mexican law is to protect a segment of the public, an alleged violation of the law does not affect a claim arising between two parties neither of whom is in the protected segment of the public. Tenneco must be a member of the class meant to be protected by that law before it may successfully invoke the defense of illegality. (*Gatti* v. *Highland Park Builders, Inc.* (1946) 27 Cal.2d 687, 690 [166 P.2d 265]; *Norwood* v. *Judd, supra,* 93 Cal.App.2d at pp. 283-284.) When this exception is applied to the case before us, it is apparent that the purpose of the Mexican law is to protect *Mexican* citizens. Tenneco is certainly not within

that protected class. The objectives of Mexican law cannot be advanced by refusing to enforce a contract between two California citizens, when the breach occurred in California, the issues are tried in a California court, and no Mexican citizen is before that court. The purpose of the Mexican law can neither be advanced nor retarded by any action taken by the trial court in California. For the defendants to gratuitously wrap themselves in the cloak of Mexican law and seek its protection is contrary to California authority. A law to protect a segment of the public should not become an unwarranted shield for the avoidance of a just obligation by those outside the class. (*Gatti* v. *Highland Park Builders, Inc., supra,* 27 Cal.2d at p. 690.)

To summarize, the majority opinion is in error for all of the following reasons: (1) the grower's operations were not illegal under Mexican law; (2) even if by some strained interpretation there was an illegal transaction originally, it had long since been consummated; (3) comity does not require application of foreign law that is clearly contrary to public policy in the United States and in California; (4) if Mexican law prohibits land ownership or holding by noncitizens, it is in conflict with international human rights doctrine; (5) if there is deemed to be a conflict of laws, under the facts of this case California law should prevail; (6) there is no real conflict of law, but only a false conflict and under that doctrine California law applies; (7) the parties herein are not in the class purportedly protected by Mexican law.

The judgment should be reversed.

The petition of plaintiffs and appellants for a rehearing was denied September 26, 1985, and the opinion was modified to read as printed above. Lucas, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.