[Civ. No. 17864.   Second Dist., Div. One.   May 17, 1951.]

MARCUS L. ROBERTS, Respondent, v. FRED L. WACHTER et al., Appellants.

Earl D. Killion for Appellants.

Marcus L. Roberts, in pro. per., and Elmer Patrick Friel for Respondent.

DRAPEAU, J.—The complaint herein alleges that in 1942, plaintiff, an active member of The State Bar of California, organized the produce firm of Drudis, Means and Wachter, with assets valued at $6,500 furnished by defendant Drudis and $20,000 cash furnished by the latter's wife. That Means and Wachter were taken in as partners but furnished no capital. Defendant Drudis was to take no active part, but under an oral agreement between him and plaintiff, the profits from his share of the business were to be divided between them in consideration for plaintiff's services in organizing the business, representing Mr. Drudis and looking after their joint interests.

It is further alleged that in 1945 the net profit from the business was $60,640.62, of which defendant Drudis' share was $22,813.54; that on December 30, 1945, plaintiff and said defendant had a settlement and an account stated was made between them that $10,406.77 was due to plaintiff, whereupon defendant Drudis paid plaintiff $6,406.77, but failed upon demand to pay the balance of $4,000.

The complaint contains a second cause of action based on a common count for money had and received for the use of plaintiff which is predicated upon the following facts: that plaintiff's 1945 profits amounting to $4,000 were on deposit with the partnership subject to plaintiff's withdrawal as in former years; that at a time when neither objection nor dispute existed as to plaintiff's withdrawal of the money, the partnership asked for and was granted by plaintiff a loan of the $4,000 which upon demand it refused to pay.

Defendant Drudis interposed a general and special demurrer which was overruled. By his amended answer, he alleged among other things that in July, 1942, he orally agreed to pay plaintiff one sixth of his share of the net profits realized from the partnership "which was in consideration of legal

services rendered and to be rendered by plaintiff to this defendant''; and that on October 9, 1942, said agreement was reduced to writing; that subsequently, either in December of 1944, or in January, 1945, he and plaintiff orally modified the agreement of October 9, 1942, whereby he agreed to pay plaintiff one half of his share in the profits after deducting an amount equal to 5 per cent on his investment, provided he had recouped his losses previously sustained.

Defendant also alleged that when the contract was orally modified, his consent thereto was procured through reliance upon statements of plaintiff that all of defendant's losses had been recouped; that such statements were false and known to plaintiff to be false; that when the contract was modified he neither had nor sought any independent legal advice because he assumed that the terms of the agreement and the modification were fair and reasonable and provided for a just and reasonable compensation; but that on the contrary the compensation provided therein was greatly in excess of the value of the services rendered and to be rendered. Accordingly, by way of counterclaim, defendant sought to recover the $6,406.77 which he had paid to plaintiff.

From a judgment in plaintiff's favor for the sum of $4,000, defendants appeal. Defendant Drudis will hereinafter be referred to as appellant.

It is here urged that the contract which was made during the existence of the relationship of attorney and client is presumptively invalid and without consideration, and that respondent did not sustain the burden of proof to overcome such presumption.

While it is true that many of the findings are negative in form, it is to be noted that the trial court affirmatively found that the parties entered into an oral agreement during the month of July, 1942, wherein appellant agreed to pay respondent one sixth of his profits from the partnership; that on October 9, 1942, a written memorandum to that effect was signed by appellant and delivered to respondent; and that subsequently, appellant orally agreed to increase respondent's share to 50 per cent of the profits accruing to appellant. From such findings, it must be inferred that the trial court was satisfied with the manner in which respondent met the burden of proof cast upon him.

Respondent testified he had known appellant since 1935; that prior to 1941 he had handled a few legal matters for him; that in 1941 he made out income tax returns for

appellant and his wife. During that year appellant sought respondent's advice regarding the acquisition of a business in which to invest some money his wife was going to give him. Respondent discouraged this and advised him to lend the money on trust deeds or mortgages. After Pearl Harbor, appellant told respondent he wanted to get into the farm produce business, and as a result of information supplied by respondent, appellant became interested in the American Produce Company, formerly owned by a Japanese who had been interned for the duration of the war. Respondent made a thorough investigation of this business and reported to appellant, who was then ready to invest but did not wish to take an active part. It was arranged that appellant should put up the money and that respondent's son-in-law, Mr. Higgins, should acquire appellant's interest as trustee and be paid a straight salary. They then discussed division of the profits and compensation to respondent, appellant agreeing that after he got 5 per cent on his invested capital, he would give respondent 50 per cent of the net profit realized from his share of the business. In respondent's words: "I was merely putting in my services and if he made any money I was to get my cut. If there were any losses that he would have to bear them . . . I would give all the time I could to looking after the business, whatever was needed. . . . He said that was satisfactory to him. . . . I was to go out and help the Japanese organize this company and look after it, see that the business was properly carried on and that I would keep close watch . . . over everything, and see that we got our proper returns from his investment. This was . . . the latter part of January, 1942." Operations started immediately, respondent handling all the details of organization, obtaining the necessary permits and bonds, and starting a bookkeeping department. Many difficulties were encountered because of evacuation of the Japanese growers and workers with resulting loss of farm connections and competent help. During this period, respondent was putting in over 10 hours a day, buying produce and hiring men. Meanwhile the bookkeeping and accounting department went awry and the business was operating at a loss. Respondent suggested discharge of the accountant, but appellant objected, saying he would rather have the accountant manage the business than respondent. "I told him I thought he was doing the wrong thing; that I was doing my best; that I thought I could straighten matters out, but if he desired it that way, it was all right with me and if he'd come to the office I would

draw up a little agreement in which we would release one another from any further obligations. . . . We signed this on June the 22nd, 1942.'' And respondent left.

Three weeks later respondent had a talk with appellant and Mrs. Drudis at which time he informed them that he believed appellant was doing the wrong thing to discontinue the business; that if appellant would not interfere with his management, he could put the business on a paying basis by carrying out plans he had formulated before he was asked to leave. It was then agreed that respondent should again manage the business but without interference from appellant. Thereupon, respondent proceeded to work out a cooperative plan through various produce growers in the State of California. While so doing, he met appellants Means and Wachter, experienced produce men who were willing to join appellant and respondent on a salary and percentage basis. By that time, appellant had no money with which to finance the continuation of the produce business. Respondent informed appellant and Mrs. Drudis that he would require $20,000 for this purpose. Mrs. Drudis said she would advance it, if it were approved by her business advisors: her brother-in-law, Mr. Hamilton Cotton of the Dominguez Land Company, and her brother, David Carson, of the Carson Estate Company. Respondent discussed the matter with both. Mr. Cotton advised appellant to quit business; Mr. Carson thought it better to continue in order to avoid loss of money already expended, and advised Mrs. Drudis to advance the $20,000 which she did. The partnership between Drudis, Means and Wachter was formed. Appellant had sustained a loss under the original agreement, and in order to help him recover it, respondent agreed in July, 1942, to reduce his percentage from 50 per cent to 1/6th of appellant's share of the net profits, or 5½ per cent of what the partnership made. Appellant in return agreed to follow respondent's advice and permit him to manage the affairs of the partnership without unnecessary interference, to wit: to keep in constant touch with the business; to see that a proper system of bookkeeping was installed; to pass upon any loans that might be made. Accordingly, respondent had the proper books installed, monthly accounts were rendered to all partners, and he arranged for the necessary licenses, bonds and insurance, and was in daily contact with the business.

The partnership was operated on this basis until October 9,

1942, when a written memorandum of the existing oral agreement was executed by appellant at respondent's request, to wit:

### "Memorandum of Agreement

"For and in consideration of legal services heretofore and hereafter to be rendered by Marcus L. Roberts for and in behalf of Jose Drudis in connection with his farming and/or Produce House undertakings, the said Jose Drudis has agreed, and by these presents does agree, to pay to the said Marcus L. Roberts, one-sixth (1/6th) of whatever he receives or is entitled to receive, including drawing account paid to him, out of and from any produce or farming partnership business of which he is a member. Said compensation and services to continue during the life of the present partnership of Drudis, Means and Wachter, and during any other partnership hereafter created as a result of death or change of membership therein.

"And the said Jose Drudis hereby authorizes the partnership of Drudis, Means and Wachter to pay the compensation of Marcus L. Roberts direct to him.

Dated *October 9th, 1942.*                    *Jose Drudis"*

Under the terms of this agreement, respondent received his allotted 1/6th share of the profits from July of 1942, through the year 1944, which he drew from the company as and when he wanted it.

Early in 1945, respondent called to see appellant and Mrs. Drudis at their home in Sierra Madre, because he wanted Mrs. Drudis "to thoroughly understand all my business relations with Mr. Drudis." Respondent there stated, "Now, owing to the fact that I reduced my percentage from fifty down to five and a half per cent, the only way I feel that I can get any real compensation out of this is that things go on smoothly and the partnership is continued. . . . You must remember that Mr. Wachter is getting about $28,000 a year and Means is getting around $20,000 a year. . . . When the five years is up they are going to be independent and they won't need your finances. . . . I don't want to see any friction or Mr. Wachter come in between us. . . . I just want to show you now what Mr. Drudis had lost in the produce business and I want to show that he has recovered all his losses." Respondent then explained at length how this recoupment of losses had been effected and stated: "When you add all those up, that is what she saved on her Federal tax report, what you saved on your State tax report and . . . considering too

the business which I established which nets about $68,000 a year. . . . I think Mr. Drudis is even, not only even with the board for what he lost in the produce business but I think altogether's he's ahead. . . . by me reducing my fifty per cent to five and a half per cent . . . It really boils down that I am paying those farm losses of his which I had nothing to do with." Mrs. Drudis then spoke up: "I think you have treated Mr. Drudis fair. I think you ought to be getting your fifty per cent now." To this respondent replied: "That's up to you people but all I am complaining about at this time is that I don't want to see any rupture of our good relations or let Wachter come in between us."

Appellants' counsel here interposed an objection to this testimony on the ground of its incompetency to vary the terms of the agreement of October 9, 1942, and stated: "I realize that some of it might be admissible under the theory that it might be an executed oral agreement up to a certain extent . . . but the excess of $4,000 remaining would still be subject to the objection." The objection was overruled.

The next day appellant went to see respondent at his home and told him: "Amelia (Mrs. Drudis) thinks you ought to be getting the fifty per cent now and I just want to let you know it is agreeable to me." Respondent replied: "Well, that's very nice of you but . . . if you are willing to do that I can afford to give your matters a great deal more of my time . . . and I agreed then to perform services that I wasn't then required to and I would try to formulate some plan so that we'd be in a position to entice these fellows to continue the partnership with us. He said it was agreeable and I said okay. Then from now on, it's a fifty-fifty basis over and above your five per cent? And he said yes."

The following language in *Estate of Phillipi*, 76 Cal.App.2d 100, 102-103 [172 P.2d 377], appears particularly applicable to the facts disclosed by the instant record: ▮ "Where such a situation exists (confidential relation of attorney and client) the rebuttable presumption of fraud or undue influence arises where the attorney profits from his dealings with his client. That presumption can only be overcome by clear and satisfactory evidence that the transaction between the attorney and his client was fair and equitable and that the attorney had taken no advantage of the relationship and that the client was fully informed as to all matters relative to the transaction. (*Estate of Witt*, 198 Cal. 407 [345 P. 197].) . . . ▮ While, in cases of this kind, the presumption can be overcome only

by clear, convincing and satisfactory evidence, the question of what constitutes such evidence, and when the presumption is overcome ordinarily and primarily, are questions addressed to the trier of fact. His conclusions on them should not be disturbed on appeal except in cases of an abuse of discretion or where there is no sufficiently substantial evidence supporting them.''

█ The evidence presented by respondent was amply sufficient to overcome the presumption of invalidity of the contract under consideration. On the other hand appellant failed to produce any evidence tending to prove his allegation that he consented to the modification because of false statements made to him by respondent regarding recoupment of losses he had previously sustained.

Neither is there anything in the record tending to establish fraud or overreaching on the part of respondent. In fact certain portions of appellant's deposition of July 7, 1949, read in evidence at the trial herein, included the following:

''Q. So far as you know, he never concealed any facts from you, did he? A. I don't know. Q. Well, so far as you know. Do you know of any facts that he concealed from you that would have changed your mind so that you would not have agreed to these terms? A. I had all the confidence in you. Mr. Roberts: That is not the question. Read the question. (Previous question read by the reporter.) Q. In other words, do you think he defrauded you in any way? A. No. Q. No. Is that your answer? A. Yes. . . . Q. Now, do you claim there is any kind of fraud by which Mr. Roberts secured this agreement for 5½ per cent? A. I don't claim any fraud. Q. Do you claim it was a fair bargain? A. I thought it was for your services. Q. You claim it was a fair bargain at a reasonable compensation? A. I believe so. . . . Q. In making that agreement you do not consider that he took advantage of any trust or confidence you had in him, do you? A. No.''

█ Appellants next urge that the oral modification of the written agreement of October 9, 1942, is prohibited by section 1698 of the Civil Code, to wit: ''A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise.''

As heretofore shown, the relationship between the parties hereto had subsisted for a number of years. Their practice was to ascertain and divide the profits each year. That custom was followed in 1945. In his amended answer appellant alleged that his share of profits for that year was $22,813.54; that

$10,406.77 was reported in his income tax return for 1945 "and in the tax return of plaintiff."

As between appellant and respondent, the oral modification respecting percentage of profits was fully executed for the year 1945. Its object was fully accomplished: The contemplated services had been performed by respondent, and the net profit from the ·partnership had been ascertained and allotted. Early in 1946, respondent drew $6,406.77 from his allotted share of $10,406.77. It was only at the request of the partnership that it be allowed the use of the balance for awhile, that respondent in April or May of 1946 consented not to withdraw the $4,000 which is the subject of this action. (See Civ. Code, § 1661, and *Estate of Morrison,* 68 Cal.App.2d 280, 285 [156 P.2d 473], where the court stated, quoting from *Treadwell* v. *Nickel,* 194 Cal. 243, 258 [228 P. 25], " 'If thereafter the relations of plaintiff and Miller & Lux were governed by such oral agreement, and its object was fully accomplished, the agreement became executed and worked a modification of the original contract of employment.' ")

Appellants argue that an account stated is an executory contract, hence is insufficient to alter the terms of a written contract.

*Twohey* v. *Realty Syndicate Co.,* 4 Cal.2d 379, 383 [49 P.2d 819], is authority for the statement: " 'An account stated is a mere unperformed promise by one party to pay a stated sum to another, and it is therefore an executory contract. (Civ. Code, § 1661; *Pearsall* v. *Henry,* 153 Cal. 314, 325 [95 P. 154, 159].)' "

As heretofore stated, performance was complete as between respondent and appellant. The money was on deposit subject to respondent's order of withdrawal. Part of it he received. He was entitled to the balance and could have withdrawn it. Instead he granted the request of the partnership and permitted the $4,000 to be used in the business "for awhile."

Appellants contend that since the instant agreement is one which was not to be performed within a period of one year, it comes under the statute of frauds, section 1624(1) of the Civil Code, and must be in writing.

As held in *Dean* v. *Davis,* 73 Cal.App.2d 166, 168 [166 P.2d 15] : "The statute of frauds has no application to an executed agreement. (*McComsey* v. *Leaf,* 36 Cal.App.2d 132, 142 [97 P.2d 242].) . . . 'When a contract has been so far performed that nothing remains to be done but the payment of the consideration for the performance, the fact that the contract

does not require the payment within a year furnishes no defense to an action for the price.' (*Hellings* v. *Wright,* 29 Cal. App. 649, 656 [156 P. 365].) In 49 American Jurisprudence 860, it is said: 'To state the rule another way, where the employee has fully performed the contract on his part and there is nothing left for the other party to do but to pay the agreed compensation, the statute does not apply, and the contract may be enforced against the employer according to its terms. Such is the view of the American Law Institute.' (See Restatement, Contracts, vol. 1, § 178.) When the parties to a contract which is not to be performed within a year have partly performed it, neither can avoid its obligation as to past transactions by objecting that it was oral and within the statute. (12 Cal.Jur. 858; *Pio Pico* v. *Cuyas,* 47 Cal. 174, 179.) ''

Since this court is of the opinion that the agreement here was fully executed for the year 1945 and prior years, the statute of frauds does not apply.

As heretofore shown, the evidence amply supports the findings and judgment.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.