**Bruce M. McNALL, an individual; Sherwood Productions, Inc., a corporation; and Star Filmes Do Brazil, LTDA., a corporation, Plaintiffs,**

v.

**Thomas P. TATHAM, an individual; and Naji Robert Nahas, an individual; and Does I through XX, Defendants.**

No. CV 85–2744 WJR.

United States District Court,
C.D. California.

Dec. 23, 1987.

Richard P. Levy, Diane B. Galfas, Meghan D. Serwin, Gibson, Dunn & Crutcher, Los Angeles, Cal., for plaintiffs.

Hardy L. Thomas, Iwasaki, Thomas & Sheffield, Los Angeles, Cal., for defendant Naji Robert Nahas.

Charles A. Moore, Ann Ryan Robertson, Reynolds, White, Allen & Cook Incorporated, Houston, Tex., for defendant Thomas P. Tatham.

## AMENDED ORDER

REA, District Judge.

This matter comes before the Court on the motions of defendants Thomas Tatham and Naji Robert Nahas for summary adjudication pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court having considered the papers filed in support thereof and in opposition thereto and having heard oral argument,

IT IS HEREBY ORDERED that the motions are GRANTED in part and DENIED in part.

The Court finds as follows:

## I. FACTS

This case arises from a course of dealing between Bruce McNall, Naji Robert Nahas and Thomas Tatham that involved at various times movie-making, horse-trading, and foreign stock market transactions. McNall, a California citizen, is the sole shareholder of co-plaintiff Sherwood Productions, a Delaware corporation doing business in California, of which co-plaintiff Star Filmes do Brazil is a Brazilian subsidiary. Nahas is a citizen of Brazil and Tatham of Texas.

In a nutshell, McNall alleges that Nahas agreed in January, 1983, to finance the Brazilian production costs of the movie *Blame it on Rio* in return for an equity stake in the picture. The money was to be provided pursuant to a series of promissory notes executed by Star Filmes and guaranteed by McNall in favor of Banco Sogeral, a Brazilian bank controlled by Nahas. Nahas was then to repay the loans when they came due, receiving in return a proportional interest in the picture.

Seventeen promissory notes, totalling approximately US $2.7 million in Brazilian cruizeros, were in fact executed between March and September, 1983, during which time the parties attempted unsuccessfully to work out the details of their agreement. When Banco Sogeral demanded payment in late 1983, McNall telexed Nahas requesting instructions on how to proceed. Nahas repaid the debt, then requested and received a telex from McNall to the Bank authorizing it to transfer any credits or guarantees to Nahas.

Negotiations continued, with meetings held in January, 1984, in Paris and in June, 1984, in Los Angeles. In the latter meeting, McNall met with Nahas' attorney, Paul Baumgarten, to attempt to resolve their primary differences, which were apparently (1) the exact percentage stake Nahas would receive, and (2) Nahas' priority in repayment relative to the European–American Bank (EAB), a previously secured lender. McNall has testified that he and Baumgarten agreed to compute Nahas' fractional interest in the picture using his contribution as the numerator and the "entire cost of everything" as the denominator. With respect to priority, McNall "caved" to the demand and agreed that Nahas would receive his percentage of proceeds "from the first dollar," subject to EAB's consent to this arrangement. In McNall's view, therefore, a final agreement was reached.

At some subsequent point, however, Nahas transferred fourteen of the promissory notes to Tatham.[1] This transaction is evidenced by a letter agreement, dated October 7, 1984, which purports to assign the notes to Tatham for $1.7 million. On the same day, Tatham purchased eleven thoroughbred horses from Nahas, at an alleged purchase price of $1 million, and granted Nahas an option to repurchase a 50% interest in any of the horses at a nominal rate. Tatham made a lump sum payment for the notes and horses in the amount of $2.7 million.[2]

The letter agreement assigning the promissory notes warrants that the maker or guarantor of the notes has no defenses or right of offset, *excepting* (in a handwritten provision) McNall's claims to (1) the proceeds of Nahas' resale of certain stock held for McNall; and (2) $150,000 that McNall alleges was loaned to Nahas and not repaid.

These two transactions further cloud the McNall–Nahas relationship. The stock transaction had its genesis in the January, 1983 meeting between McNall and Nahas. Upon McNall's return to Los Angeles, he sent $500,000 to Nahas to be used to purchase stock in Petrobras, the Brazilian government-controlled oil company. McNall claims that Nahas agreed to act as his agent in purchasing the shares, and would sell them and account for the proceeds upon request. He further claims that such a demand was made, but that he has seen nothing from the transaction.

Nahas agrees that he received the $500,-000, stating that this represented at the time CR $135,315,000. He then states that he sold the shares on December 5, 1983, for

---

1. Of the original seventeen notes, the first three were endorsed by the Bank as being paid on the account of Star Filmes, and were thus extinguished. The other fourteen were endorsed in blank and were thus negotiable. No clear explanation for the differential treatment emerged from the pleadings or hearing.

2. Plaintiffs allege, pointing to various irregularities, that the horses were worth considerably

more than $1 million, and that most or all of the amount paid for the notes is actually allocable to the horse purchase. Defendants' devalued estimate of the horses' worth is thus attacked as a subterfuge masking the fact that Tatham was simply serving as a collection agent on the notes and is therefore subject to any defenses that could be asserted against Nahas.

CR $532,290,236 and, with McNall's consent, applied the proceeds to the Star Filmes loan obligations.

The loan transaction allegedly took place in February, 1983, when McNall transferred $150,000 to Nahas for production costs of *Blame it on Rio* that Nahas was allegedly obligated to pay. The agreement was oral. Although Nahas does not remember receiving this amount in February, he does say he was expecting such a sum from McNall in the spring and that any monies received were expended on behalf of Star, Sherwood, and McNall.

Ultimately, Tatham demanded payment on the notes from McNall. Plaintiffs responded by filing this action, which seeks a declaratory ruling that the notes were either extinguished when Nahas repaid them pursuant to the oral agreement, or are subject to a fraud claim against Nahas arising from the same transaction. The complaint also contains claims for breach of contract and breach of fiduciary duty stemming from the Petrobras transaction, and breach of contract in connection with the $150,000. Tatham has counterclaimed for payment on the notes.

The matter comes before the Court on the motions of both defendants for summary adjudication of various issues. Nahas seeks rulings that: (1) the film participation "agreement" is so lacking in essential terms as to be unenforceable; (2) enforcement is in any event barred by the Statute of Frauds; (3) Brazilian law applies to the Petrobras transaction; (4) the Petrobras transaction is void for illegality; and (5) the claim for $150,000 must fail for lack of proof. Tatham joins in Nahas' motion and in addition asks the Court to rule that (1) Brazilian law applies to the enforcement of the notes; (2) Tatham is a holder of the notes; and (3) Tatham is entitled to attorneys' fees.

## II. DISCUSSION

On motions for summary adjudication, it is the moving parties' responsibility to demonstrate that there are no genuine issues as to any material fact and that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court does not weigh conflicting evidence nor make credibility determinations at this stage of the litigation. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.1987).

### A. ENFORCEABILITY OF THE FILM AGREEMENT

#### 1. *Governing Law*

■ A federal court sitting in a diversity action applies the substantive choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). For purposes of this issue, however, application of these rules is unnecessary. While each party has at some time tentatively suggested that Brazilian law should apply to this agreement, neither has carried its burden of briefing the Court on the Brazilian law of contract formation and enforceability.[3] For purposes of this motion, then, 'the Court will assume that the law of Brazil is the same as the law of California.' *See Bowman v. Grolsche Bierbrouwerij B.V.*, 474 F.Supp. 725, 730 (D.Conn.1979).

#### 2. *Agreement as to Essential Terms*

■ Nahas first argues that, even assuming that an agreement to agree was reached in January, 1983, several material provisions were left to future agreement. Reciting a detailed chronology of the subsequent negotiations, Nahas concludes that the "alleged agreement has no definition; it is an amoeba constantly taking whatever form suits the Plaintiffs."

**3.** Plaintiffs first indicated a desire to rely on Brazilian law at the hearing on this motion. They now insist that if the Court chooses to apply Brazilian law to the promissory notes, the same law must apply to the film agreement, since it constitutes a defense to the notes. The Court disagrees. The film agreement is a threshold issue in this case; if found valid, the notes created pursuant to it ceased to exist as negotiable instruments when paid by Nahas. For the law governing the film agreement to be dictated by the law governing a distinct subagreement would indeed be a case of the tail wagging the dog.

Specifically, defendants contend that the course of negotiations left the following terms uncertain:

1. Whether the official or "parallel" exchange rate would be used to convert the cruizeros supplied by Nahas into dollars for purposes of comparing Nahas' contribution to those of other investors, and what date would be used for the conversion;

2. The amount to be used as the denominator of the ratio used to determine Nahas' interest;

3. Whether the resulting percentage would be applied to net profits or gross receipts;

4. Whether Nahas would be subordinate to EAB in order of repayment;

5. When Nahas was to be repaid; and

6. In what currency he was to be paid.

Plaintiffs, on the other hand, contend that agreement was reached as to each of these terms. Relying on McNall's deposition testimony, they allege as follows:

1. *Conversion Rate and Date:* While the evidence indicates that McNall first thought conversion of the cruizeros to dollars would be at the parallel (unofficial) rate, he testified that the final understanding was that an average of the official and parallel rates was to be used, calculated at the time the advances were made.

2. *Numerator and Denominator of Fraction:* Nahas' fractional interest in the film was to use the above method to determine the numerator, with the denominator to be the total investment in the film.

3. *Revenue to which Percentage Applied:* While the drafts sent by McNall's attorney consistently proposed net profits, McNall says he agreed that the percentage would be applied to Sherwood's gross receipts from all distribution sources.

4. *Priority:* Though McNall claims that Nahas knew originally that EAB had a security interest in the film and had priority as to repayment, Nahas eventually insisted that his repayment not be subordinate to EAB. McNall claims he agreed to this and obtained authorization from EAB.[4]

5. *Currency:* McNall's understanding was that Nahas wished to be repaid in dollars.

6. *When Interest was to be Paid:* Nahas would be paid "in the normal course of distribution as revenues were received."

Because McNall's deposition testimony raises genuine issues of fact as to whether an agreement was reached in each respect listed by movants, the Court must deny summary judgment on these grounds. Conflicts in extrinsic evidence as to whether an agreement was reached are for the fact-finder to resolve; only when its terms are clear do issues of construction, including whether it is sufficiently certain, become questions of judicial interpretation. *See United California Bank v. Maltzman,* 44 Cal.App.3d 41, 49, 118 Cal.Rptr. 299 (1974). This applies equally to oral contracts. *Brawthen v. H & R Block, Inc.,* 28 Cal.App.3d 131, 138, 104 Cal.Rptr. 486 (1972).

3. *Certainty of the Terms of the Agreement*

■ A distinct branch of Nahas' argument that the agreement is too indefinite to enforce is his contention, first refined in his Reply Brief, that the provision "gross receipts as derived from all distribution sources relating to the film" is in itself too uncertain as a matter of law. Nahas asserts that the content of this term is normally the subject of extensive negotiation in film finance contracts—citing the exhaustive definitions offered in the course of

---

**4.** Nahas vigorously denies that McNall ever obtained such approval, citing the deposition testimony of the EAB banker, Mr. Berman, that no final agreement was reached, as well as a subsequent loan agreement in September 1984 that failed to note any security interest other than EAB's. This at best creates an issue of fact, however, and is therefore not determinative of this motion for summary adjudication.

negotiations by the parties in this case.[5] He concludes that "gross receipts" is too indefinite a standard to guide a jury.

The standard for certainty is expressed by Corbin as follows:

> A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think they have made a contract; they must have expressed their intentions in a manner that is capable of understanding.

1 *Corbin on Contracts,* Sec. 107 (1963). Thus in *Soar v. National Football League Players Ass'n,* 438 F.Supp. 337 (D.R.I. 1975), an oral agreement providing for retroactive pension coverage for older football players was ruled fatally indefinite because it did not specify the terms of eligibility or schedule of benefits. In response to plaintiff's argument that the contract was an agreement with the specifics to be worked out later, the court stated: "This principle would be of little help to a jury charged with determining how the parties would have resolved the ... complicated questions that would have to be answered before the contract could be carried out." *Id.* at 343.

The Court accepts Nahas' contention that "gross receipts" must be defined in greater detail before it may be presented to a jury. In part because the specific issue was not raised until the Reply Brief, however, the Court is not satisfied that "gross receipts" cannot be made sufficiently certain (1) through evidence that the parties attached a particular meaning to the term, or (2) by reference to such extrinsic evidence as custom and usage in the film industry.

> The contract here ... is sufficiently broad, uncertain in its meaning to require an examination into extrinsic circumstances to ascertain the intent of the

parties. In such circumstances it is the primary duty of the trial court to construe the language after a full opportunity afforded to all parties in the case to produce evidence of facts, circumstances and conditions surrounding its effect and the conduct of the parties relating thereto. Such a duty is not performed, cannot be performed by the summary judgment procedures.

*Loree v. Robert F. Driver Co.,* 87 Cal. App.3d 1032, 1039–40, 151 Cal.Rptr. 557 (1978) (citations omitted). The motion for summary adjudication that the agreement is too indefinite is therefore denied.[6]

### 4. Statute of Frauds

■ Nahas next contends that enforcement of the oral agreement is barred under the Statute of Frauds because the contract, though silent as to duration, was clearly intended to be performed over a period longer than one year.[7] Cal.Civ.Code Sec. 1624(1); *Newfield v. Insurance Co. of the West,* 156 Cal.App.3d 440, 447, 203 Cal. Rptr. 9 (1984); *Tostevin v. Douglas,* 160 Cal.App.2d 321, 325, 325 P.2d 130 (1958).

The Court finds the Statute of Frauds inapplicable to the facts and procedural posture of the instant case. This is not an action to enforce a contract, in the sense of demanding performance from a recalcitrant party. Rather, plaintiffs seek a declaration that certain past conduct was performed pursuant to an alleged agreement. The existence of that agreement, at least in preliminary form, is essentially uncontested, as is the fact that extensive and frequently documented negotiations ensued. Significant questions of fact exist concerning whether final agreement was reached on terms specific enough to enforce, but in light of this evidence, permitting a party

---

**5.** Though Nahas attempts to show that ambiguity is inherent by referring to differences between the cited proposed definitions, only one of these purports to define "gross receipts"; the other deals with "net profits."

**6.** The denial of the motion rests solely on the grounds outlined above. Plaintiffs' remaining counter-arguments, relying generally on the conduct of the parties, are unresponsive to defendant's certainty argument. While the con-

duct of the parties does tend to confirm the existence of a preliminary agreement, it does not address the contention that any contract that could be implied from such conduct is too indefinite to enforce.

**7.** For instance, Sherwood had entered into a fifteen year distribution agreement with 20th Century Fox, during which time Nahas would be entitled to receive royalties.

who has under one view already rendered full performance to retroactively deny the existence of the contract would work an inequity that furthers no legitimate purpose of the Statute of Frauds.[8]

### B. LAW GOVERNING DAMAGES FOR FRAUD

■ Plaintiffs contend that even if the notes are not deemed extinguished by virtue of Nahas' repayment under the oral contract, their enforcement is subject to a fraud claim against Nahas arising from the same events. Defendants' motion does not seek summary judgment against this claim; it does, however, assert that the claim should be governed by Brazilian law.

California choice of law rules are in a state of transition. In tort actions, the California Supreme Court began to depart from the traditional "place of the wrong" test in *Reich v. Purcell*, 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (1967), acknowledging that when application of the law of the place of the wrong would defeat the interests of the states and litigants concerned, California and other states have refused to apply it. *Id.* at 555, 63 Cal.Rptr. 31, 432 P.2d 727. Subsequent cases often applied the Second Restatement of Conflicts, which considers a number of factors with a view toward determining which state has the more significant relationship to the occurrence and the parties. More recent cases have applied the "governmental interest" test, in which the law of the forum is applied unless a 'true conflict' exists between it and the competing law. Such conflicts are resolved by evaluating the comparative impairment of each state's policy interests. *See Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (1978); *American Re–Insurance Co. v. Insurance Com'n*, 527 F.Supp. 444, 451 (C.D.Cal. 1981).

Under the approach set out in *Liew v. Official Receiver and Liquidator*, 685 F.2d 1192 (9th Cir.1982), a court applying the governmental interest test is to: (1) examine the competing substantive laws to determine if they differ as applied to this transaction; (2) if they do differ, determine whether both jurisdictions have an interest in having their laws applied, thus presenting a "true conflict"; and (3) if there is a true conflict, proceed to determine which jurisdiction's interest would be more impaired by subordination of its policy to the other's. *Id.* at 1196.

The threshold question is whether the competing laws differ in their application to this case. No such showing is made with respect to the substantive elements of fraud, and the Court declines to make any ruling in that regard. The availability of punitive damages, however, presents a clear conflict in that Brazilian law does not recognize the concept of exemplary damages. Brazilian Civil Code, Sec. 1059.

The next step is to determine whether each jurisdiction has a legitimate interest in seeing its policy applied. In *Hernandez v. Burger*, 102 Cal.App.3d 795, 162 Cal.Rptr. 564 (1980), a Mexican plaintiff sued a California defendant in California for damages suffered in a car accident in Mexico. The court ruled that "California has no legitimate interest in the possible deterrent effect of its unlimited recovery rule on conduct in Mexico," and therefore found that a "false conflict" was presented. *Id.* at 800, 162 Cal.Rptr. 564.

The claim at issue involves a Brazilian defendant who allegedly fraudulently induced a California plaintiff to enter into Brazilian loan obligations. This case is therefore distinguished from *Hernandez* in that the plaintiff is a California citizen, and California's policy interest in deterring fraudulent acts against its citizens cannot be deemed illegitimate. Hence a true conflict is presented.

The final step is to determine which jurisdiction's interest would be more greatly

---

**8.** The full performance defense to the Statute of Frauds, relied upon by plaintiffs, generally requires that the party asserting the contract have rendered full performance. *See* 2 Corbin on Contracts, Secs. 457–58; *Roberts v. Wachter*, 104 Cal.App.2d 271, 280–81, 231 P.2d 534 (1951). While it is instead the party asserting the Statute who has in this case allegedly fully performed, the evidentiary function of full performance, on the facts of this case, is equally satisfied.

impaired by the subordination of its policy interests to those of the other state. Damage limitations are generally supported by a state's interest in protecting residents against excessive or oppressive economic liability. *See, e.g., Hurtado v. Superior Court,* 11 Cal.3d 574, 582–83, 114 Cal.Rptr. 106, 522 P.2d 666 (1974).

Plaintiffs urge that California's interest prevail, drawing an analogy to *Bernhard v. Harrah's Club,* 16 Cal.3d 313, 128 Cal. Rptr. 215, 546 P.2d 719 (1976). In that case, the California high court applied forum law to a negligence action despite the fact that the actionable conduct, negligence in furnishing liquor to intoxicated persons, occurred in Nevada and the defendant corporation was a Nevada citizen. In ruling that the forum state's interest in deterring such conduct outweighed those underlying Nevada's non-liability rule, the court emphasized that it was the purposeful and systematic nature of defendant's commercial contacts with California that brought the defendant "within California's regulatory sphere." *Id.* at 322, 128 Cal.Rptr. 215, 546 P.2d 719.

No similar level of commercial contact is alleged in this case. Accordingly, the Court concludes that Brazil's interest in protecting against unlimited liability would be more impaired than California's in deterring fraud where the defendant is Brazilian, the conduct involves a Brazilian bank loan, and was not an outgrowth of purposeful and systematic commercial contacts with the forum state, California. Brazilian law shall therefore control the availability of punitive damages.

## C. LAW GOVERNING DAMAGES FOR BREACH OF FIDUCIARY DUTY

■ The claim for breach of fiduciary duty arises from the alleged failure of Nahas to account for the proceeds from the purchase and resale of stock in Petrobras, the Brazilian government-controlled oil company, on account for McNall. Defendants seek only a determination that Brazilian law will apply; at stake is the availability of any damages beyond restitution of the principal with interest.

Despite defendants' contention that Brazilian law should apply to the entire cause of action, no exposition is made of the standards governing agent/principal relations. As with the discussion on the fraud claim above, the Court therefore declines to make any ruling as to which law shall control the substantive elements of this claim.

The damage limitation analysis also parallels that outlined above. Here, Nahas contends not only that Brazilian law does not recognize the concept of exemplary damages, but that Nahas, as a "mandatario" of McNall's, would be liable only for the return of the principal plus interest. Brazilian Civil Code, Secs. 1061, 1288, 1303.

We therefore turn again to the governmental interest test to determine whether these damage limitations shall apply. The underlying facts differ from those discussed above. While the subject of the fraud claim is the inducement of plaintiffs to enter into the Banco Sogeral promissory notes, here it is abuse of a principal/agent relationship entered into for the purpose of acquiring shares in the Brazilian state-controlled oil company. That a conflict exists is clear, as is the legitimacy of each state's interest in the application of its policies under these circumstances.

Comparing the relative impairment of state interests, if California law is not applied, its policy of punishing and deterring abuses of confidential relationships would be impaired, to the extent such abuses are committed by Brazilian citizens and relate to Brazilian transactions. Brazil's interest in limited liability would be comparatively more impaired. Its purpose of avoiding oppressive liability and promoting certainty in terms of risk analysis is subverted by subjecting resident agents of foreign principals to foreign damages awards based on their domestic activities. The Court therefore finds that Brazilian law shall apply to the availability of damages for the alleged breach of fiduciary duty.

## D. ILLEGALITY OF THE PETROBRAS CONTRACT

As to plaintiffs' breach of contract claim, Nahas moves for summary judgment on

the grounds that the contract was void for illegality. Nahas alleges that McNall entered the contract in the belief that he was participating in a scheme to corner the market in privately-held Petrobras shares, in violation of Brazilian law.

### 1. *Governing Law*

■ Brazilian Civil Code Art. 145–II renders any legal action null and void where its objective is illegal. This principle presents no conflict with California law, since it is axiomatic that contracts whose objective is illegal are unenforceable at common law. Cal.Civ.Code Sec. 1550.

The issue at hand concerns which law shall be used to assess the legality of the contract. Nahas urges that the offense be defined under Brazilian law and offers several Brazilian provisions relating to elimination of competition and abuse of economic power. After noting that the United States also has enacted laws in the area, he concludes that since United States policy would not be violated, the Court should apply Brazilian law under the principle of comity. *Wong v. Tenneco*, 39 Cal.3d 126, 216 Cal.Rptr. 412, 702 P.2d 570 (1985) (contract to be performed in Mexico in violation of Mexican law not enforced despite legality under law of forum). McNall counters with the argument that if United States policy is in accord with Brazil's, then under the governmental interest test a "false conflict" exists and forum law should be applied.

"Comity teaches that 'a contract ... made with a view of violating the laws of another country, though not otherwise obnoxious to the law ... of the forum ... will not be enforced.'" *Wong*, 39 Cal.3d at 135, 216 Cal.Rptr. 412, 702 P.2d 570 (citing 15 Williston on Contracts (3d ed. 1972) Sec.

1748, p. 121). The interplay between this doctrine and otherwise applicable choice of law rules appears to be uncharted. Divergent results seem unlikely, however, since the "public policy" exception to the doctrine of comity plays a role analagous to the interest-balancing that occurs within the governmental interest analysis.[9]

In any event, such a choice is unnecessary. Even were the Court to proceed under a governmental interest test, a false conflict would be presented in that California has no legitimate interest in applying its securities and antitrust regulations to a Brazilian stock market transaction.[10] Brazil is entitled to enforce its regulations in that area, and its law shall therefore define any substantive offense the contract may have violated.[11]

### 2. *Summary Judgment as to Illegality*

■ To support his allegation that McNall knowingly participated in an illegal scheme to monopolize Petrobras shares, Nahas offers McNall's statement that:

Nahas was very, very anxious that I do this [purchase the shares]. I got the sense of it that not unlike the silver days he was trying to control the marketplace and thought by getting as many friends and people around him as he could to buy the stock itself, if not in fact the value of the company.

Nahas also points to several portions of McNall's deposition testimony which indicate that he thought Nahas was trying to "corner the market" in Petrobras shares and argues that these constitute binding judicial admissions. This argument is irrelevant. To avoid obligations under a contract on grounds of illegality, the consideration for or the object of the agreement

**9.** As the name implies, the public policy exception precludes application of a foreign state's law where to do so would violate California's public policy. *Wong*, 39 Cal.3d at 135, 216 Cal. Rptr. 412, 702 P.2d 570.

**10.** Where a conflict is patently "false," the Court does not read the governmental interest analysis outlined in *Liew, supra,* so rigidly as to require it to first ascertain whether different results would obtain under the competing laws. Such an approach would needlessly entail full brief-

ing on both laws and a virtual mini-trial on the merits. In this situation, the first test should be met if the laws are sufficiently different so that similarity of result is not immediately apparent.

**11.** Though not directly raised in the pleadings, it should be noted that this decision in no way precludes the Court from utilizing its equitable power to order restitution to prevent unjust enrichment. *See generally Wong, supra.*

must in fact be illegal. *Trumbo v. Bank of Berkeley,* 77 Cal.App.2d 704, 709, 176 P.2d 376 (1947); 1 Witkin, *Summary of California Law,* Contracts, Sec. 341 (1973). At best, a question of fact has been raised in this regard, and summary judgment is denied.

## E. THE ORAL LOAN AGREEMENT

■ Nahas seeks summary judgment against plaintiffs' breach of contract claim stemming from the alleged $150,000 loan on the grounds that plaintiffs can adduce no proof that the transaction ever occurred. Plaintiffs counter that the contract was oral and provide deposition testimony supporting the claim.

Quite clearly, genuine issues of material fact exist as to this claim, and the motion for summary judgment must be denied.

## F. LAW GOVERNING ENFORCEABILITY OF THE NOTES

■ As noted, Tatham's motion for summary adjudication seeks determination of three issues: (1) whether Brazilian law governs the enforcement of the notes; (2) whether Tatham is a holder of the notes under Brazilian law; and (3) whether he will be entitled to attorneys' fees under Brazilian law.

Application of California law to a transaction within the purview of the California Commercial Code is governed by Cal. Comm.Code Sec. 1105(1), which provides that in the absence of a choice of law by the parties, the Code applies to transactions "bearing an appropriate relation to California." Whether a transaction bears

an appropriate relation to California may be determined in contract actions by reference to Cal.Civ.Code Sec. 1646. *Barclays Discount Bank Ltd. v. Bogharian Bros.,* 568 F.Supp. 1116, 1118–19 (C.D.Cal.1983), *aff'd,* 743 F.2d 722 (9th Cir.1984). Under Sec. 1646, "a contract is governed by the law and usage of the place where it is to be performed, or, if place of performance is not indicated, by the law and usage of the place where it is made." *Henderson v. Superior Court,* 77 Cal.App.3d 583, 592, 142 Cal.Rptr. 478 (1978).

In *Barclays,* Judge Tashima found that under Sec. 1105(1), California bore an appropriate relation to a transaction in which notes were endorsed by California defendants in Israel to an Israeli, but were payable in dollars upon demand in banks located in California. The Ninth Circuit affirmed, rejecting the argument that under Sec. 216(1) of the Restatement (Second) of Conflicts of Law (1971), Israeli law should apply to the issue of whether plaintiffs were holders in due course.[12] As a statutory choice of law provision intended to effect a change in common law choice of law principles,[13] Sec. 1105(1) supercedes Restatement principles. *Barclays Discount Bank Ltd. v. Levy,* 743 F.2d 722, 725 (9th Cir.1984).

This transaction clearly does not bear an appropriate relation to California so as to support application of California law. In contrast to *Barclays,* the notes here were issued by a Brazilian bank and were payable in Brazil in Brazilian currency. Even the maker of the notes, Star Filmes, is Brazilian. Only McNall, the guarantor, is an American. Because Brazil is the place of performance, place of making, and place

---

**12.** Sec. 216(1) provides that the local law of the state where a negotiable instrument was at the time of the transfer of an interest in the instrument determines the validity and effect of the transfer as between persons who were not both parties to the transfer. Sec. 216(2) reiterates this rule with respect to determining holder in due course status. *See Pintel v. K.N.H. Mohamed & Bros.,* 107 Cal.App.2d 328, 881, 237 P.2d 315 (1951).

**13.** California courts traditionally applied different choice of law tests to issues of (1) validity of the contract (place of making), (2) capacity of the parties (place of making), and (3) interpretation or performance (place of performance). The comment to Sec. 1105(1), on the other hand, interprets this provision as stating that where the relation is "appropriate," the Code shall apply to the *entire* transaction, thus avoiding parcelling out commercial transactions among the laws of several states. Cal.Comm. Code Sec. 1105(1), comment 4.

at time of transfer, its law properly applies to this transaction. Cal.Civ.Code Sec. 1646; Restatement (Second) of Conflicts of Law, Sec. 216 (1971).[14]

## G. TATHAM'S STATUS AS HOLDER

Although Tatham does not seek a ruling that he is a holder in due course of the promissory notes at this time, he does move for summary adjudication on the issue of whether he is a holder of the notes under Brazilian law. Presumably, this legal conclusion is to follow from the fact that he is in lawful possession of notes which were endorsed in blank.

This motion must be denied on two grounds. First, it is entirely unclear from the pleadings whether "holder" is a legal status cognizable under the Brazilian law of negotiable instruments. Moreover, if such a ruling entails a finding that Tatham is in lawful possession of *enforceable* notes, this is clearly an issue of fact, inasmuch as plaintiffs contend that Nahas repaid the notes on their account. If their view prevails, the notes ceased to exist as bills of credit under the Brazilian law presented by the plaintiffs.[15]

## H. AVAILABILITY OF ATTORNEYS' FEES

Tatham contends that Brazilian law provides for recovery of attorneys' fees in actions such as this, and therefore seeks a ruling that he will be entitled to recover such fees should he prevail in this litigation. Because that issue has not yet presented itself, the Court declines to rule on it at this time.

For all the above reasons, defendants' motions for summary adjudication are GRANTED in part and DENIED in part.

**14.** Plaintiffs argue that the governmental interest test should be applied and that forum law should govern due to the lack of a true conflict. The Court has found no case, however, applying the governmental interest test to a conflicts question involving the validity and interpretation of negotiable instruments. In *Ashland Chemical Co. v. Provence,* 129 Cal.App.3d 790, 181 Cal.Rptr. 340 (1982), cited by plaintiffs, the court applied the California statute of limitations to bar an action upon notes entered into in Kentucky which would have been enforceable under the law of that state. The actual interpre-

tation of the instrument and its transfer were not at issue, rendering *Ashland* inapposite to the instant case. The Court therefore refuses to circumvent the statutory choice of law provision embodied in Cal.Comm.Code Sec. 1105(1) through application of common law principles. *See Barclays, supra.*

**15.** Because the motion is denied on these grounds, the Court does not reach plaintiffs' subsidiary arguments as to the nature of the endorsement to Tatham. *See supra,* note 2.