Filed 11/17/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TAK CHUN GAMING PROMOTION COMPANY LIMITED,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>KEVIN C.S. LONG,<br><br>    Defendant and Respondent. | B317918<br><br>(Los Angeles County Super. Ct. No. 21BBCV00094)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on October 26, 2023, be modified as follows:

1. On page 11, in lines 5 and 6 of footnote 4, delete the phrase "Tak Chun distastefully implies" and replace it with the

phrase "Tak Chun's comparison could be read to distastefully imply" so the full footnote reads as follows:

> 4　　Tak Chun's comparison to our Supreme Court's decision in *In re Marriage Cases* (2008) 43 Cal.4th 757 is ill conceived, for this decision was an acknowledgment that persons of different sexual orientations are entitled to the equal protection of the law authorizing marriage rather than, as Tak Chun's comparison could be read to distastefully imply, an illustration of a "substantial shift of public acceptance or morality" in California.

\* \* \*

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

CHAVEZ, Acting P. J.　　　HOFFSTADT, J.　　　KWAN, J.\*

_____

\*　　Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 10/26/23 (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TAK CHUN GAMING PROMOTION COMPANY LIMITED,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>KEVIN C.S. LONG,<br><br>    Defendant and Respondent. | B317918<br><br>(Los Angeles County Super. Ct. No. 21BBCV00094) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Kralik, Judge. Affirmed.

Greenan, Peffer, Sallander & Lally, John P. Makin, Nelson S. Hsieh, and Helen H. Chen for Plaintiff and Appellant.

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, Thomas R. Freeman, Ekwan E. Rhow, and Kimmy Yu for Defendant and Respondent.

* * * * * *

During our state's infancy, our Legislature declared "[t]he common law of England" to be "the [default] rule of decision in all the courts of this State." (Civ. Code, § 22.2; see also former Pol. Code, § 4468; *Merritt v. Hill* (1894) 104 Cal.184, 185.) In so doing, our state imported the English common law rule that prohibits resort to the courts to enforce gambling debts. (E.g., *Bryant v. Mead* (1851) 1 Cal. 441, 442-443 (*Bryant*).) In the intervening 173 years, our state has legalized many discrete types of gambling. Does this shift to a selective and partial legalization of gambling warrant the abandonment of the common law rule shuttering the California courts to lawsuits seeking to enforce gambling debts? We hold that it does not. The public policy basis for not legalizing gambling and the public policy basis for not providing a judicial forum to enforce gambling debts are distinct; erosion of the former does not call the latter into question. We consequently agree with the trial court that the lawsuit in this case seeking to enforce a gambling debt was properly dismissed. Thus, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

Kevin C.S. Long (Long) resides in Arcadia, California, and holds a Chinese resident identification card. In 2019, Long made several trips to Macau, which is an autonomous region on the south coast of China.[1] Gambling is legal in Macau.

While in Macau, Long entered into seven loan agreements with Tak Chun Gaming Promotion Company Limited (Tak Chun)—one in January 2019, five in September 2019, and one in

---

[1] Macau is officially known as the Macao Special Administrative Region of the People's Republic of China.

November 2019.  Tak Chun is a licensed junket operator that owns and operates gaming clubs inside Macanese casinos; among other things, Tak Chun loans funds to gamblers.  The agreements obligated Long to repay the loaned amounts within 30 or 45 days, or face an interest rate at "five times the amount stipulated by law" in Macau.  The agreements did not contain a forum selection clause.

Tak Chun loaned Long "casino tokens" worth a total of $88 million in Hong Kong currency (that is, over US$11 million); Long repaid only HK$13,668,680 (that is, around US$1.7 million).

## II.   Procedural Background

On February 1, 2021, Tak Chun sued Long in a California state court seeking HK$74,331,320 (that is, US$9,904,787) under causes of action for (1) breach of contract, (2) quantum meruit, and (3) common counts.

Long moved for judgment on the pleadings, arguing that the lawsuit was barred by California's public policy against allowing the California courts to be used as a forum for enforcing gambling debts, even when the gambling giving rise to those debts was lawful where it occurred.[2]  Tak Chun opposed, urging that this public policy was now outdated.  After further briefing and a hearing, the trial court granted Long's motion.

The court acknowledged that California's legalization of certain pockets of gambling had "undoubtedly reduced the integrity and moral force" of California's public policy against *gambling*, but ruled that the prohibition on using California's

---

[2]   Prior to Long's filing of this motion, the parties litigated Tak Chun's application for a writ of attachment against Long's assets, which the trial court denied.

3

courts as a forum *to collect gambling debts* had been a "clear[] and consistent[]" policy for "hundreds of years."  As for Long specifically, the court noted that he was "headed down the road to perdition," yet Tak Chun continued "giving him more help along the way again and again and again."  The court concluded that "California['s] public policy" "strongly disfavor[ing]" the "enforcement of gambling debts" barred Tak Chun's claims.

Following the entry of judgment for Long, Tak Chun filed this timely appeal.

## DISCUSSION

Tak Chun argues that the trial court erred in granting judgment on the pleadings.

A motion for judgment on the pleadings is appropriate when the operative complaint "does not state facts sufficient to constitute a cause of action . . . ."  (Code Civ. Proc., § 438, subds. (c)(1)(B)(ii) & (c)(3)(B)(ii).)  A motion brought on this basis is equivalent to a demurrer (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777), such that our task is to examine the complaint's allegations and any judicially noticed documents in order to assess whether the pled causes of action are legally viable (*ibid.*; *Barajas v. Sativa L.A. County Water Dist.* (2023) 91 Cal.App.5th 1213, 1224 (*Barajas*)).  A cause of action is not viable if, as pertinent here, it offends public policy. (*Griffin v. McCoach* (1941) 313 U.S. 498, 506 ["It is 'rudimentary' that a state 'will not lend the aid of its courts to enforce a contract founded upon a foreign law where to do so would be repugnant to good morals . . . or . . . violate the public policy of the State where the enforcement of the foreign contract is sought'"].)  As to contract claims specifically, although public policy encourages the making of contracts, the courts will decline

4

to enforce a contract if it violates "'"'sound public policy.'"'" (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 184.)

We independently evaluate whether the trial court properly granted judgment on the pleadings.[3] (*Barajas*, *supra*, 91 Cal.App.5th at p. 1224.) We also independently review any subsidiary questions of law, including whether enforcement of a contract in the California courts is contrary to public policy. (*Bovard v. American Horse Enterprises, Inc.* (1988) 201 Cal.App.3d 832, 838.)

## I.     California's Public Policy Against the Enforcement of Gambling Debts

Although Tak Chun's complaint alleges three causes of action, all seek to enforce the gambling debts Long incurred in Macau. Thus, the legal viability of Tak Chun's claims turns on whether California provides a judicial forum for their adjudication.

It does not.

In 1850, our Legislature enacted a statute declaring that "[t]he common law of England . . . is the rule of decision in all the

---

[3]     Our review of a judgment on the pleadings ordinarily includes a second step—that is, whether the trial court abused its discretion in denying leave to amend. (*Starlight Cinemas, Inc. v. Massachusetts Bay Ins. Co.* (2023) 91 Cal.App.5th 24, 31-32.) We need not reach that issue because Tak Chun conceded in the trial court that any amendment "would not be useful" to this "issue of law" and because Tak Chun has not asked this court to grant leave to amend. (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924 [leave to amend properly denied where cause of action is legally invalid and cannot be cured by additional allegations]; *Starlight Cinemas*, at p. 32 [appellant has burden of proving an amendment would cure legal defect].)

courts of this State" unless "repugnant to or inconsistent with" federal or state constitutional law or state statutes. (Civ. Code, § 22.2; former Pol. Code, § 4468; *Tufeld Corp. v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 21 ["Since the beginning of California's statehood, the common law of England has been the law of the state except where it conflicts with the United States Constitution or other California law"].) Through this statute, California imported not only the "whole" "'body of judge-made,'" decisional law of the English courts, but also "the written statutes enacted by Parliament." (*Martin v. Superior Court* (1917) 176 Cal. 289, 292-293 (*Martin*); *People v. Williams* (2013) 57 Cal.4th 776, 782; *Moore v. Purse Seine Net* (1941) 18 Cal.2d 835, 838-839; *Tennant v. John Tennant Memorial Home* (1914) 167 Cal. 570, 573-574; but see *In re Estate of Fair* (1901) 132 Cal. 523, 534 [excluding "'English statutes'" from definition of "'common law'"], overruled by *Martin*, at pp. 292-293.) Among the enactments of Parliament adopted as California common law was the Statute of Anne, which declared all gambling debts "utterly void, frustrate, and of none effect, to all intents and purposes whatsoever." (9 Anne, ch. 14, § 1.)

On this basis, our Supreme Court has issued a long line of unbroken decisions "traced back virtually to the inception of statehood," declaring the California courts off limits when it comes to enforcing gambling debts. (*Kelly v. First Astri Corp.* (1999) 72 Cal.App.4th 462, 477 (*Kelly*); *Bryant, supra*, 1 Cal. at pp. 442-443; *Carrier v. Brannan* (1853) 3 Cal. 328, 329 (*Carrier*).) With one exception, the intermediate appellate courts have all uniformly toed that line. (*Lane & Pyron, Inc. v. Gibbs* (1968) 266 Cal.App.2d 61, 64-65; *Metropolitan Creditors Service v. Sadri* (1993) 15 Cal.App.4th 1821, 1824 (*Metropolitan*); *Kelly*, at p. 477;

*Kyablue v. Watkins* (2012) 210 Cal.App.4th 1288, 1294 (*Kyablue*); but see *Crockford's Club Ltd. v. Si-Ahmed* (1988) 203 Cal.App.3d 1402, 1406 (*Crockford's Club*).)

Adhering to this line of precedent, the trial court properly dismissed Tak Chun's complaint because it seeks to use the California courts to enforce Long's gambling debts.

## II.    Tak Chun's Arguments

Tak Chun offers what boil down to three reasons why we should take the common law of our state in a new direction and depart from this precedent.

### A.    *The "loosening morality" argument*

First and chiefly, Tak Chun makes a "times have changed" argument.  It observes that, over the last several decades, California has legalized gambling in four discrete areas—namely, (1) pari-mutuel horse racing (Bus. & Prof. Code, § 19400 et seq.); (2) the California State Lottery (Cal. Const., art IV, § 19, subd. (d); Gov. Code, § 8880 et seq.); (3) draw poker clubs and similar card games (Bus. & Prof. Code, § 19800 et seq.); and, although it springs from a federal mandate, (4) gambling on tribal land pursuant to the federal Indian Gaming Regulatory Act of 1988 (25 U.S.C. §§ 2701-2721).  From this receptivity to legalize gambling in certain circumstances, Tak Chun extrapolates that it "defies facts and logic" to believe that there remains any "moral" justification for shuttering the California courts to claims seeking to collect gambling debts.

To be sure, California's public policy against gambling has "wan[ed]" and "eroded" somewhat as our state's initial and more sweeping prohibition against gambling—as embodied in prior iterations of the California Constitution and Penal Code section 330—has given way to the legalization of discrete types of

gambling. (Cal. Const., art. IV, § 19 [authorizing certain types of gambling but prohibiting Legislature from "authoriz[ing] . . . casinos of the type currently operating in Nevada and New Jersey"]; Pen. Code, § 330 [enumerating gambling in many instances as a misdemeanor]; see *Kyablue, supra*, 210 Cal.App.4th at p. 1293 [noting "waning public policy against gambling in general"]; *Metropolitan, supra*, 15 Cal.App.4th at p. 1828 [noting how "California's historical public policy against gambling has been substantially eroded"]; *Crockford's Club, supra*, 203 Cal.App.3d at p. 1406 [noting "expanded acceptance of gambling in this state"]; *Nevcal Enterprises, Inc. v. Cal-Neva Lodge, Inc.* (1961) 194 Cal.App.2d 177, 180 (*Nevcal*) [noting how "modern day[] Californians" are no longer "too pious" about "gambling"].) What was once a mostly impermeable wall against gambling is undoubtedly more porous.

But there are three reasons why this shift in public attitude toward some types of gambling does *not* erode the public policy against opening the California courts to the litigation of gambling debts.

First, the public policy that justifies keeping litigation over gambling debts out of the California courts is independent of— and hence not inextricably dependent upon—the public policy prohibiting gambling. (*Metropolitan, supra*, 15 Cal.App.4th at p. 1828 [noting the "critical distinction" between those two policies].)

Originally, the public policy against litigating gambling debts in the California courts was grounded in two rationales— namely, (1) that gambling *itself* was immoral and unlawful, such that the courts should not open their doors to vindicate rights grounded in immoral or unlawful contracts (*Bryant, supra*, 1 Cal.

at pp. 442-443; *Carrier, supra*, 3 Cal. at p. 329; *Union Collection Co. v. Buckman* (1907) 150 Cal. 159, 162, 164; *Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 135 (*Wong*); *Lee On v. Long* (1951) 37 Cal.2d 499, 502; *Braverman v. Horn* (1948) 88 Cal.App.2d 379, 381; *Lavick v. Nitzberg* (1948) 83 Cal.App.2d 381, 383; *Fong v. Miller* (1951) 105 Cal.App.2d 411, 413 (*Fong*); *Tokar v. Redman* (1956) 138 Cal.App.2d 350, 353; *Homami v. Iranzadi* (1989) 211 Cal.App.3d 1104, 1109-1110; *Kyablue, supra*, 210 Cal.App.4th at p. 1292; see generally, Civ. Code, §§ 1667 [contract is "not lawful" if it is "contrary to good morals"], 1607 ["consideration of a contract must be lawful"]); and (2) that closing the courts to litigation over gambling debts "discourage[s]" the creation of such debts, which is good for public policy because gambling—whether unlawful *or lawful*—leads to the "ruin of [the gamblers'] families," and courts should not "'become a handmaid of [such] iniquity,'" for doing so would be "humiliating to the Courts" (*Takeuchi v. Schmuck* (1929) 206 Cal. 782, 786-787; *Bryant*, at p. 442; *Wallace v. Opinham* (1946) 73 Cal.App.2d 25, 28; *Carrier*, at p. 329; *Homami*, at pp. 1111-1113; *Metropolitan, supra*, 15 Cal.App.4th at p. 1829).

Critically, however, either of these two rationales is sufficient *on its own* to support the public policy of denying a judicial forum in California for adjudicating gambling debts. This is why, from the very beginning, "California's public policy against judicial resolution of civil claims arising out of gambling contracts or transactions" has "applie[d] to all forms of gambling, *whether legal or illegal*." (*Kelly, supra*, 72 Cal.App.4th at pp. 490, 480, italics added; *Bryant, supra*, 1 Cal. at p. 444 [noting that legality of gambling by holding a license would not "confer[] a *right to sue* for a gaming debt"]; *Hamilton v. Abadjian* (1947) 30

9

Cal.2d 49, 51-52 (*Hamilton*) [refusing to adjudicate gambling debt incurred in Nevada, where gambling is legal].)  And it is why the "substantial[] ero[sion]" of the "public policy against" gambling has not eroded "California's deep-rooted policy against [the] enforcement of gambling debts."  (*Metropolitan*, *supra*, 15 Cal.App.4th at p. 1828.)  Other jurisdictions have reached similar conclusions.  (Accord, *King International Corp. v. Voloshin* (Conn.Super.Ct. 1976) 366 A.2d 1172, 1174-1175; *Carnival Leisure Indus. v. Aubin* (5th Cir. 1991) 938 F.2d 624, 626; *Cie v. Comdata Network* (Ill.App.Ct. 1995) 656 N.E.2d 123, 128.)

The only California case to disagree with this otherwise unbroken line of precedent is *Crockford's Club*, *supra*, 203 Cal.App.3d 1402.  *Crockford's Club* held that the "expanded acceptance of gambling" in California justified opening the California courts for adjudicating a claim to enforce an English default judgment based on a casino gambling debt incurred in England, where the gambling was legal.  (*Id.* at p. 1406.) *Crockford's Club* is an outlier in that it is the only decision to conflate the public policy against gambling with the public policy against using the California courts as a forum for enforcing gambling debts; tellingly, its three-paragraph analysis of this issue did not cite—let alone distinguish—*Hamilton* or any of its progeny (*Metropolitan*, *supra*, 15 Cal.App.4th at p. 1828 [so observing]), choosing instead to cite a single out-of-state case applying that state's different public policy.  Not surprisingly, every court to subsequently consider the issue has rejected *Crockford's Club*.  (*Ibid.*; *Kelly*, *supra*, 72 Cal.App.4th at pp. 485-488.)  We join that chorus.

Second, the premise of Tak Chun's argument—that California has legalized gambling—is overstated.  California did

10

not flip a switch from "all gambling is illegal" to "all gambling is legal." Instead, California has maintained its longstanding presumptive constitutional and statutory rules against gambling, but has expanded the types of gambling for which that presumption has been rebutted. But California has not fully embraced the legalization of all gambling. Just last year, for instance, the California voters *rejected* two ballot propositions that would have legalized in-person gambling on tribal lands and online sports betting. (Voter Information Guide, Gen. Election (Nov. 8, 2022), text of Prop. 26, archived at <https://perma.cc/RB66-XEQY> [as of Oct. 23, 2023]; Voter Information Guide, Gen. Election (Nov. 8, 2022), text of Prop. 27, archived at <https://perma.cc/69PA-3ZDG> [as of Oct. 23, 2023].) Contrary to what Tak Chun implies, California has not become Sodom and Gomorrah.[4]

Third, our Legislature has at no point expressed an intent to deviate from the common law rule barring resort to the California courts to enforce gambling debts. To be sure, our Legislature has the power to alter the common law. (*People v. Hickman* (1928) 204 Cal. 470, 479; *Lowman v. Stafford* (1964) 226 Cal.App.2d 31, 39.) But it must *exercise* that power—either by an express repeal of the common law or by a "plain[] declaration of legislative intent" that necessarily (but implicitly) repeals the common law. (*Saala v. McFarland* (1965) 63 Cal.2d

---

4       Tak Chun's comparison to our Supreme Court's decision in *In re Marriage Cases* (2008) 43 Cal.4th 757 is ill conceived, for this decision was an acknowledgment that persons of different sexual orientations are entitled to the equal protection of the law authorizing marriage rather than, as Tak Chun distastefully implies, an illustration of a "substantial shift of public acceptance or morality" in California.

11

124, 130 ["""Statutes are not presumed to alter the common law otherwise than the act expressly provides""""]; *Martin*, *supra*, 176 Cal. at pp. 296-297; *Shaw v. Superior Court* (2022) 78 Cal.App.5th 245, 258.) Absent such an exercise,[5] we must presume our Legislature and the voters were aware of the preexisting common law rule against use of the courts to adjudicate gambling debts at the time they added new islands of legalized gambling amid an ocean of its presumptive illegality, and by not countermanding that rule—either expressly or implicitly—they thereby opted to leave the common law rule in place. (*Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2021) 12 Cal.5th 493, 503; *People v. Giordano* (2007) 42 Cal.4th 644, 659.) Tak Chun's subsidiary argument that we must infer an intent to alter the common law rule from legislative or voter *silence* accordingly has it backwards. Indeed, Nevada's common law rule against resort to its courts to enforce gambling debts persisted despite that state's legalization of gambling until the Nevada Legislature enacted a statute that expressly overturned its common law rule. (Compare *West Indies, Inc. v. First Nat. Bank of Nevada* (Nev. 1950) 214 P.2d 144 [adopting Statute of Anne into Nevada's common law] with Nev. Rev. Stat.

---

[5] At oral argument, Tak Chun pointed us to a regulation authorizing "cardroom business[es]" to "extend credit" to their patrons. (Cal. Code Regs., tit. 4, § 12388, subd. (a).) But this regulation does not purport to authorize enforcement in court of any resulting debts. Indeed, the regulation's very existence—and its self-imposed limitation that it does not apply if extending credit is otherwise "prohibited by any statute, law, regulation, or local ordinance" (*ibid.*)—reaffirms that our Legislature has *not* overturned the longstanding common law rule against the enforcement of gambling debts in California courts.

Ann. § 463.368 (1983) [statute altering common law rule and allowing for the enforcement of gambling debts in Nevada courts].)  California has yet to do that.  (*Kelly*, *supra*, 72 Cal.App.4th at p. 489 ["The Legislature has not enacted a statute permitting the use of the process of the courts in California to resolve" gambling-related claims].)

## B.    *The "weighing" argument*

Second, Tak Chun argues that the common law rule declaring the California courts off limits to disputes over gambling debts does not erect an absolute barrier; rather, it obligates courts to make a case-by-case determination of whether to grant access to the courts after weighing a variety of factors, including (1) the "relative moral fault of the plaintiff and the defendant," (2) "whether refusing a remedy can protect the public," (3) "the degree of moral turpitude involved," and (4) "whether application of the [common law] rule will result in the unjust enrichment of the defendant at the expense of the plaintiff."  (*Kyablue*, *supra*, 210 Cal.App.4th at p. 1293.)  For support, Tak Chun cites *Kyablue* as well as *Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 218-219, *Kelton v. Stravinski* (2006) 138 Cal.App.4th 941, 949, and *Southfield v. Barrett* (1970) 13 Cal.App.3d 290, 294.  (See also *Fong*, *supra*, 105 Cal.App.2d at p. 413.)

This argument mixes apples and oranges.  The cases Tak Chun cites all address whether a court, after invalidating a contract on public policy grounds, should nonetheless grant some type of *equitable relief* despite the absence of a contract.  This is irrelevant to this case, as the invocation of California's public policy against enforcing gambling debts does not invalidate any of the loan agreements between Tak Chun and Long; instead, we

hold that those contracts may not be enforced *in this forum*. Tak Chun remains free to attempt to enforce them in a different forum, and Tak Chun's decision not to have insisted that Long agree in those contracts to litigate disputes arising therefrom in a particular forum lies with Tak Chun and Tak Chun alone. There is no support in the case law to let California courts decide—on a case-by-case basis—whether to lift the denial of access after weighing various factors. Indeed, such a case-by-case weighing process would significantly undercut the efficacy of the across-the-board ban California has adopted by leaving it to individual judges to decide whether to apply the ban; the exception would swallow the rule, and quite likely force our courts into the role of "handmaid[s] to iniquity."

### C.    *The "change the common law" argument*

Third and lastly, Tak Chun urges us to exercise our authority as a common law court, and reject the common law rule in favor of the outlier decision in *Crockford's Club*, *supra*, 203 Cal.App.3d 1402.

To be sure, the common law of California is meant to be "'flexib[le].'" (*Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 393-394.) Thus, we as a court have the ability to "modify[] . . . the common law" (*Schmier v. Supreme Court* (2000) 78 Cal.App.4th 703, 709), and even have a duty to modify the common law "'[w]henever an old rule is found unsuited to present conditions or unsound'" (*Rodriguez*, at p. 394). We accordingly reject Long's contention that our Legislature's use of a statute in 1850 to cut and paste English common law into California somehow transmogrified and elevated that decisional law into something statutory in nature, and hence beyond the power of the courts to modify. (Cf. *People v. Tufunga* (1999) 21 Cal.4th

14

935, 950 [courts lack the authority to modify statutes when they disagree with "the wisdom of the Legislature's chosen" rule].)

However, for the reasons articulated above, we conclude that the common law rule barring resort to the California courts to collect gambling debts rests on a rationale with continued vitality—namely, a policy of discouraging the creation of those debts and the financially ruinous consequences that often flow from them, regardless of whether those debts were lawfully incurred.

Tak Chun resists this conclusion with what boil down to four arguments.

First, Tak Chun asserts that a common law doctrine may be upheld only if the rationale *originally* articulated to support it remains viable, such that the concern articulated by recent decisions that gambling is an addiction (and even a mental illness) cannot support adherence to the common law rule barring use of the California courts to enforce gambling debts. (See *Metropolitan*, *supra*, 15 Cal.App.4th at p. 1830 [citing the Diagnostic and Statistical Manual of Mental Disorders].) This assertion ignores that the common law rule barring use of the California courts to collect gambling debts has—*since its inception*—relied on *two* rationales, one tied to the underlying illegality of most gambling at that time and the other aimed at discouraging judicial enforcement of gambling debts and their ruinous consequences even when those debts were incurred lawfully. Modern innovations in the diagnosis of mental health conditions may better explain the second rationale by expanding on *why* certain gamblers incur debts that lead to ruinous consequences—but they do not somehow erase that these

15

consequences have been a justification for California's public policy from the very beginning.

Second, Tak Chun contends that the common law rule reaches beyond its current rationale. Specifically, it argues that (1) the sole rationale for barring the enforcement of gambling debts in the California courts is to protect gambling addicts, (2) gambling addicts comprise only a subset of all gamblers, and (3) the bar against enforcing *all* gambling debts is overbroad because it bars litigation to enforce the debts of gamblers who are not addicts. Although the second step of Tak Chun's argument may be correct (*Metropolitan*, *supra*, 15 Cal.App.4th at p. 1830), the first and third steps are most certainly not. The first step is wrong because, as explained above, the common law rule barring litigation of gambling debts in the California courts is *not* based solely on a need to protect *gambling addicts* against ruin; instead, it is meant to protect *all* gamblers against such ruin. And the third step is wrong because—even if the sole justification for the common law rule was to protect addicts—the right to enforce a gambling debt is not a "fundamental right" triggering strict scrutiny (*People v. Chatman* (2018) 4 Cal.5th 277, 288), such that the "fit" between the "ends" (of protecting gambling addicts) and the "means" (by not allowing for enforcement of any gambling debt in California courts) need not be "[]perfect" (*Heller v. Doe* (1993) 509 U.S. 312, 321); it need only be *rational*, and here it is because closing off California courts as a forum is one step toward protecting those addicts (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 180 ["[t]he Legislature is permitted to attack problems one step at a time"]), even if it additionally protects non-addicts.

16

Third, Tak Chun urges that the common law rule is riddled with so many "exceptions" that it should be abandoned, and points to three such "exceptions." Yet the "exceptions" Tak Chun identifies do not undermine the rule so much as they reasonably define its contours. To begin, California courts may enforce out-of-state judgments regarding gambling debts, but this does no more than reflect the deference accorded to a sister state's judgments under principles of full faith and credit. (*Kelly*, *supra*, 72 Cal.App.4th at pp. 476-477; *Metropolitan*, *supra*, 15 Cal.App.4th at p. 1824.) Where, as in this case, a gambling debt has yet to be reduced to a judgment and is merely a cause of action, full faith and credit considerations do *not* trump, and the common law embodying California's public policy against using the California courts to facilitate collection of those debts applies. (*Kelly*, at pp. 476-477; *Metropolitan*, at p. 1824.)[6] Next, California courts may ostensibly entertain a lawsuit by a credit card company to enforce its unpaid debts, even if its customer has used the card to purchase one or more lottery tickets, but in such a situation, the credit card company would have no foreknowledge that the card would be used to purchase lottery

---

[6] Similar concerns provide one potential way to harmonize *Crockford's Club*, *supra*, 203 Cal.App.3d 1402, with the bulk of other precedent. The plaintiff in that case sought to enforce a foreign country's *judgment*. Because full faith and credit only applies to the judgments of other states and not other countries, full faith and credit considerations did not trump. (*Wong*, *supra*, 39 Cal.3d at p. 135; *Metropolitan*, *supra*, 15 Cal.App.4th at p. 1828.) That being said, the fact that the plaintiff was seeking to enforce a judgment makes that case different from the typical case where, as here, the plaintiff is seeking to litigate their claim in the first instance.

tickets. (See *Rose v. Nelson* (1947) 79 Cal.App.2d 751, 751-752 [recognizing "exception[]" to the "general rule" barring access to the courts "when there is no evidence that the lender knew that the loan was intended to be used for gambling purposes"].) Where, as in this case, the lender knows that the money will be used for gambling (as Tak Chun knew because it tendered Long casino tokens), the common law rule applies. Lastly, California courts will entertain a lawsuit seeking an accounting following a transaction to sell a casino (*Nevcal*, *supra*, 194 Cal.App.2d at pp. 180-182), but such a lawsuit does not directly involve any gamblers and hence does not hasten any gambler's financial ruin; while such a lawsuit involves the gambling industry *in general*, it does not implicate the rationale underlying the common law rule.

Fourth and finally, Tak Chun argues that tradition alone is not sufficient to sustain this public policy-based common law prohibition against the enforcement of gambling debts in the California courts. As we have explained, this prohibition has a still-viable and still-vital rationale that goes far beyond upholding "tradition for tradition's sake."

**DISPOSITION**

The judgment is affirmed.  Long is entitled to his costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>**.


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
CHAVEZ


_____, J.*
KWAN

---

\*     Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.